FILED _____ LODGED
_____ RECEIVED

AUG 13 2008

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY_____ DEPUTY

Lynn Ann Hust
1502 N.E. 20th Avenue
Battle Ground, WA 98604
Phone #360-608-7439
lynnhust@officialhmusa.com
www.emccray.com
Plaintiff, Pro Se

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| Lynn Ann Hust,<br><br>Plaintiff,<br>vs.<br>(1) The State of Wyoming;<br>(2) The State of Washington;<br>(3) Dave Freudenthal, Governor of the State of Wyoming;<br>(4) Christine O. Gregoire, Governor of the State of Washington;<br>(5) Richard C. Bohling, Prosecuting and Attorney for Albany County, State of Wyoming;<br>(6) Gwendolyn K. Smith, Police Officer, Laramie Police Department, City of Laramie, State of Wyoming;<br>(7) A. Joe Hageman, Attorney and City Council Member, City of Laramie, State of Wyoming;<br>(8) City Council, The City of Laramie, County of Albany, State of Wyoming;<br>(9) County Board of Commissioners, The County of Albany, State of Wyoming;<br>(10) Second Judicial Circuit Court, County of Albany, State of Wyoming;<br>(11) Laramie Police Department, City of Laramie, Wyoming;<br>(12) Albany County Sheriff's Department, County of Albany, State of Wyoming;<br>(13) Battle Ground Police Department, City of Battle Ground, State of Washington; | No. **C08 5501** FDB<br><br>CIVIL RIGHTS COMPLAINT<br><br>(42 U.S.C. §§ 1983; 1985(3); and 1988)<br><br>Rule 9(b) (Fraud)<br><br>JURY TRIAL DEMAND |



08-CV-05501-CMP

(14) Clark County Sheriff's                )
Department, County of Clark, State of      )
Washington;                                )
(15) Office of the Clark County            )
Prosecuting Attorney, County of Clark,     )
State of Washington;                       )
(16) District Court, County of Clark,      )
State of Washington;                       )
(17) Superior Court, County of Clark,      )
State of Washington;                       )
(18) County Board of Commissioners,        )
County of Clark, State of Washington;      )
(19) City Council, The City of Battle      )
Ground, State of Washington;               )
(20) Washington State Patrol, State of     )
Washington;                                )
(21) Laramie Plains Community              )
Federal Credit Union;                      )
(22) Laramie Boomerang;                    )
(23) Casper Star-Tribune, Casper,          )
Wyoming;                                   )
(24) News Corporation;                     )
(25) MediaNews Group;                      )
(26) The Associated Press;                 )
(27) Arthur David Curtis, Prosecutor,      )
Clark County, Washington;                  )
(28) Doe One Battle Ground Police          )
Arresting Officer, May 1, 2006;            )
(29) Doe Two Battle Ground Police          )
Arresting Officer, May 1, 2006;            )
(30) Doe Three Battle Ground Police        )
Arresting Officer, June 13, 2006;          )
(31) Doe Four Battle Ground Police         )
Arresting Officer, June 13, 2006,          )
                          Defendants.

---

## I.     Introductory Statement.

1.     All of plaintiff's injuries and damages, and the injuries and damages of plaintiff's former employer, Events WorldWide, are directly derived from two distinct continuing fraud conspiracies—the Federal Workforce Investment Act of 1998 Continuing Fraud Conspiracy (WIA Conspiracy), in existence since the year of 1998 and the Federal Interstate Extradition Continuing Fraud Conspiracy (IECFC),

in existence since the year of 1789; both of which flourish with the aid of lawyers and or legal advocates.

2.      The evils of fraud and conspiracy, with the aid of lawyers and or legal advocates, are working in unison, harmony and perfect agreement and accord in this civil rights action.

3.      The legal requirement that the integrity of the legal profession be maintained and self-policed is the central issue that controls the numerous conflicts in which this court will find the defendants.

4.      The defendants each, personally or through their agents or employees, deliberately took a sure means to "elude all laws and violate them in fact without appearing to break them in form". They each accomplished their deeds with the aid of lawyers and or legal advocates.

5.      The WIA continuing fraud conspiracy, with the aid of lawyers and or legal advocates, eludes and violates numerous provisions of Titles 18, 29 and 31, United States Code.

6.      The IECFC, with the aid of lawyers and or legal advocates, eludes and violates numerous provisions of the Constitution and Laws of the United States; namely, the Clauses of Full Faith and Credit, Extradition, Warrants, Oath of Affirmation, Supremacy, Due Process, and Equal Protection and Title 18 United States Code §§ 2, 3, 4, 241, 242, 371, 1001, 1028, 1201, 1341, 1343, 1346, 1503 and 1951.

7.      The defendants each, personally or through their agents or employees, with the aid of lawyers and or legal advocates, deliberately took a sure means to prevent or aid in preventing EWW and plaintiff from blowing the whistle on the illegal WIA fraud conspiracy and the IECFC to the Federal Government.

8.      The defendants each, personally or through their agents or employees, with the aid of lawyers and or legal advocates, knew, that should one or more participants agree to intentionally commit an act or intentionally refrain from committing an act that would thwart the goals and purpose of the WIA continuing fraud conspiracy, that they would be successful in preventing plaintiff from blowing the whistle on the illegal WIA continuing fraud conspiracy; and that the same would result in EWW and plaintiff receiving injuries and incurring damages.

9.      The defendants each, personally or through their agents or employees, with the aid of lawyers and or legal advocates, performed one or more act of craft and unfairness which should have no countenance in this Honorable court.

10.     Using the common plans of the WIA Conspiracy and the IECFC, the defendants each, personally or through their agents or employees, with the aid of lawyers and or legal advocates, lulled EWW and plaintiff into security.

11.     Plaintiff and EWW both left the City of Laramie under no impression that they would be maliciously attacked in the defendant press and with the use of the governmental powers of the defendants each, personally or their agents or employees and or the personal and professional friends and associates of each defendant with the aid of lawyers and or legal advocates.

12.     The evils of fraud, coupled with the evils of the two continuing conspiracies and the conduct of the defendants each, personally or of their agents or employees and or the personal and professional friends and associates of each defendant, with the aid of lawyers and or legal advocates, is sufficient, if it be established by proof, to warrant a court of conscience to do justice as prayed in this civil rights complaint.

13.     The WIA continuing fraud conspiracy, with the aid of lawyers and or legal advocates, prevented EWW from meeting its contractual obligations with the Federal Government and its employees all, including plaintiff Lynn Ann Hust.

14.     The defendants all, with the aid of lawyers and or legal advocates, contributed to and or liable for plaintiff's injuries and damages derived from the operation of the aforementioned two distinct continuing fraud conspiracies.

II.     Jurisdiction.

15.     This court has original, supplemental and complete diversity jurisdiction over this action pursuant to the following provisions:

        Article III, Federal Constitution.
        28 U.S.C. § 1331 (Federal question).
        28 U.S.C.A. § 1332 (Diversity of citizenship).
        28 U.S.C.A. § 1337 (Commerce).
        28 U.S.C.A. § 1366 (Construction of references to laws of the United
        States
        or Acts of Congress).
        28 U.S.C.A. § 1367 (Supplemental jurisdiction).
        28 U.S.C.A. § 1651 (All Writs Act).
        Rules 17, 18, 19, 20 and 21, Fed.R.Civ.P.

16.     The relief requested is specifically authorized by:

        28 U.S.C.A. § 1361 (Mandamus).
        28 U.S.C.A. § 2201 (Creation of a remedy).

28 U.S.C.A. § 2202 (Further relief).
28 U.S.C.A. § 2412 (Attorney fees).
31 U.S.C.A. § 3730(d) (Award to Qui Tam plaintiff).

III.   Venue.

17.   Venue is proper pursuant to:

28 U.S.C. §§ 1391(a)(3), (c) and (e)(1) and (3) (Venue generally).
28 U.S.C. § 1411 (Jury trials).

IV.   Parties.

18.   At all times mentioned, Plaintiff was and still is a citizen of the United States and resident of the State of Washington, presently residing in the County of Clark.

19.   The prosecution giving rise to this petition was commenced under color of state law in the name of Defendant State of Wyoming on December 20, 2005. The initial Warrant of Arrest was issued in the name of Defendant State of Wyoming. The prosecuting attorney who commenced the prosecution in the name of Defendant State of Wyoming represented the Defendant County of Albany, Wyoming.

20.   Defendant State of Washington was brought into this action under color of Federal and State Law by an application for requisition by Defendant Bohling made on the Defendant Governor of Wyoming; and a demand of the Defendant Governor of Defendant State of Wyoming having been made on the Defendant Governor of the State of Washington for a citizen of Defendant State of Washington declared to be a fugitive from justice under Title 18 U.S.C.A. § 3182.

21.   Dave Freudenthal, Governor of Wyoming, was brought into this action under color of Federal and State Law by Defendant Albany County, Wyoming Prosecuting and Attorney Richard C. Bohling. On May 29, 2006, Defendant Governor Dave Freudenthal signed the warrant that demanded Defendant Washington Governor Gregoire "arrest and secure" Plaintiff. On May 29, 2006, Joseph B. Meyer, Secretary of State of Wyoming certified Defendant Governor Freudenthal's signature and affixed the Seal of the State to the Demand.

22.   Defendant Christine O. Gregoire, Governor of Washington, complied with the Demand of Defendant Governor Freudenthal and executed her "Governor's Warrant of Arrest and Extradition" on June 15, 2006. The Secretary of State of Defendant State of Washington affixed the Seal of the State of Washington to this document.

23.   Defendant District Court, County of Clark, State of Washington, without entertaining a hearing for habeas corpus, transferred jurisdiction to Defendant

Superior Court, County of Clark, State of Washington for the illegal arrest that occurred on May 1, 2006 and the illegal arrest that occurred on June 13, 2008. Both Defendant District Court and Defendant Superior Court exercised jurisdiction they did not possess due to the absence of valid extradition warrants from the Governors from the States of Wyoming and Washington. Defendant Superior Court currently exercises custody of Plaintiff Lynn Ann Hust under the conditions of bail having been posted for $3,000.00.

24.     Defendant District Court, County of Clark, State of Washington, without entertaining a hearing for habeas corpus, was initially responsible for establishing judicial custody of Plaintiff Lynn Ann Hust; Plaintiff Hust's release on custody to bail; and the subsequent transfer of jurisdiction to Defendant Superior Court, Clark County, Washington for the illegal arrest that occurred on May 1, 2006 and the illegal arrest that occurred on June 13, 2008. Defendant District Court and Defendant Superior Court exercised jurisdiction they did not possess due to the absence of valid extradition warrants from Defendant Governors from Defendant States of Wyoming and Washington at the time it proceeded to act.

25.     Defendant Richard C. Bohling, Albany County, Wyoming County Prosecuting and Attorney is responsible for commencing the instant alleged malicious prosecution at the instigation and insistence of Defendant Laramie Attorney and City Councilman A. Joe Hageman. In an email dated June 22, 2006, Attorney A. Joe Hageman admitted he was responsible for getting the ball rolling on the malicious prosecution on May 24, 2005. Said alleged malicious prosecution was commenced on December 20, 2005 in the Second Judicial Circuit Court, County of Albany, State of Wyoming, before the Honorable Circuit Court Judge Robert A. Castor.

26.     Defendant Police Officer Gwendolyn K. Smith, City of Laramie, State of Wyoming is responsible for executing an alleged perjured police affidavit to support Defendant Laramie Attorney and City Councilman A. Joe Hageman and Defendant Prosecutor Bohling's alleged malicious prosecution. On September 26, 2005, Defendant police officer SMITH executed the alleged perjured police affidavit in the City of Laramie, State of Wyoming before Notary Public Jennifer Maze. Said alleged malicious prosecution was commenced on December 20, 2005 using Defendant Gwen Smith's alleged perjured police affidavit in the Second Judicial Circuit Court, County of Albany, State of Wyoming, before the Honorable Circuit Court Judge Robert A. Castor.

27.     Defendant A. Joe Hageman, Attorney and City of Laramie, Wyoming City Council Member is responsible for the instigation and insistence of the commencement of the malicious prosecution by Defendant Richard C. Bohling, Albany County, Wyoming County Prosecuting and Attorney. In an email dated June 22, 2006, Defendant Attorney A. Joe Hageman admitted he was responsible for getting the ball rolling on the malicious prosecution on May 24, 2005. Said alleged

malicious prosecution was commenced on December 20, 2005 in the Second Judicial Circuit Court, County of Albany, State of Wyoming, before the Honorable Circuit Court Judge Robert A. Castor.

28.     Defendant City Council, City of Laramie, State of Wyoming exercises control of Defendant police officer Gwendolyn K. Smith and all other employees of Defendant City of Laramie Police Department through the City Manager and the City of Laramie Police Chief. Defendant City of Laramie pays the salary of police officer SMITH and the other police officers; and provides funding support for the police's daily activities.

29.     Defendant County Board of Commissioners, County of Albany, State of Wyoming exercises political and administrative control over the City of Laramie; the county courts; Defendant Laramie Police Department; the Federal constitutional oath of office and employment of Defendant Prosecutor Richard C. Bohling; and the election of Defendant Prosecutor Bohling. On May (illegible), 2006, Jackie Gonzalez, County Clerk of the County of Albany, State of Wyoming, certified Prosecutor Bohling's official capacity when she executed a "COUNTY CLERK'S CERTIFICATES TO OFFICIAL CAPACITY OF COUNTY ATTORNEY, JUSTICE OF THE PEACE AND CLERK OF COURT", Extradition Form No. 5 in support of Republican Prosecutor Richard C. Bohling's extradition application to Governor Dave.

30.     Defendant Laramie Police Department, City of Laramie, State of Wyoming exercises operational and administrative control over Defendant police officer Gwendolyn K. Smith and all other employees of Defendant City of Laramie Police Department through Defendant City of Laramie Police Chief. Defendant City of Laramie pays the salary of Defendant police officer SMITH and the other police officers; and provides funding support for the police department's daily activities.

31.     Defendant County of Clark, State of Washington exercises political and administrative control over the county courts; Defendant City of Battle Ground, State of Washington; Defendant Battle Ground Police Department; the Federal constitutional oath of office and employment of certain persons employed by the Clark County Prosecuting Attorney; employees of the City of Battle Ground, Washington Police Department through the City of Battle Ground. Defendant City of Battle Ground pays the salary of the police officers involved in the May 1, 2006 and June 13, 2008 illegal arrests of Plaintiff.

32.     Defendant City Council, City of Battle Ground, State of Washington exercises operational and administrative control over the Battle Ground Police Department, City of Battle Ground through the Police Chief, City of Battle Ground Police Department. Defendant City of Battle Ground pays the salary of the police officers involved in the May 1, 2006 and June 13, 2008 illegal arrests of Plaintiff.

33.     Defendant Battle Ground Police Department, City of Battle Ground, State of Washington, exercises operational and administrative control over the police officers involved in the May 1, 2006 and June 13, 2008 illegal arrests of Plaintiff through the Police Chief. The City of Battle Ground pays the salary of the police officers involved in the May 1, 2006 and June 13, 2008 illegal arrests of Plaintiff.

34.     Albany County, Wyoming Sheriff's Department, through Sheriff Jim Ponds, was responsible for: (1) service of the December 20, 2005 illegal warrant issued by Judge Robert A. Castor; (2) entering Judge Robert A. Castor's illegal warrant into the criminal computer; (3) illegally amending Judge Robert A. Castor' illegal warrant to reflect "full extradition"; (4) service of the extradition warrants issued by Wyoming Governor Dave Freudenthal on May 29, 2005 and Washington Governor Christine Gregoire on June 15, 2006; (5) delivering Governor Freudenthal's warrant to Governor Gregoire; (6) arresting and securing Plaintiff in Battle Ground, Washington; and (7) custody and transportation of Plaintiff to Albany County, Wyoming to stand trial for the malicious prosecution commenced by Prosecutor Richard C. Bohling on behalf of attorney and Laramie City Councilman A. Joe Hageman.

35.     Defendant Clark County Sheriff's Department provided administrative support to the police abductors of the Battle Ground Police Department on May 1, 2006 when it used the wires in interstate commerce to request a copy of the false extradition warrant from the Clark County, Wyoming Sheriff's Department in an endeavor to justify the police officer's illegal arrest of Plaintiff without warrant and without prior power, authority and jurisdiction given to them from The Governors of the States of Wyoming and Washington.

36.     Defendant Washington State Patrol, State of Washington provided administrative support to the police abductors of the Battle Ground Police Department on May 1, 2006 when it used the wires in interstate commerce to create a "rap sheet" on Plaintiff based on the false extradition warrant obtained by the Clark County, Wyoming Sheriff's Department in an endeavor to justify the police officers' illegal arrest of Plaintiff without warrant and without prior power, authority and jurisdiction given to them from the Governors of the States of Wyoming and Washington.

37.     Defendant Office of the Clark County Prosecuting Attorney provided alleged fraudulent prosecutorial support to the police abductors of the Battle Ground Police Department on May 2, 2006 and June 2, 2006 when it manufactured "boilerplate" false extradition warrants and charging documents in an endeavor to justify the police officers' illegal arrest of Plaintiff on May 1, 2006 without warrant and without prior power, authority and jurisdiction given to them from the Governors of the States of Wyoming and Washington in the following forms:

**Manufactured document #1 (May 2, 2006):**

"OFFENSE: That she, LYNN ANN HUST, in the County of Clark, State of Washington, is on Tuesday, May 2, 2006, a fugitive in Clark County, Washington and is charged with the following crimes and is subject to arrest and extradition under the following warrants, in violation of RCW 10.88.320 and RCW 10.88.330. (Fugitive From Justice)."

| County/State | Warrant | Judge/Clerk of the Court |
|---|---|---|
| ALBANY, WY | CR-2005-198 | ROBERT A CASTOR |
| Crimes: | FRAUD BY CHECK | |

38.   The court is encouraged to note the fraud in this manufactured document since it is impossible for a fugitive to violate RCW 10.88.320 and 10.88.330.

**Manufactured document #2 (June 2, 2006):**

THIS MATTER having come on previously before the Court on Tuesday, May 2, 2006, and on that date the defendant having been previously committed to the County Jail for a period not exceeding thirty (30) days pursuant to RCW 10.88.340, and the Court having reviewed the matter,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that defendant is hereby committed to the County Jail until service of the Governor's Warrant, a period not exceeding sixty (60) days, to enable the arrest of the accused to be made under a Warrant of the Governor on the executive authority of Wyoming, the State having jurisdiction of the crime(s), unless the accused gives bail in the amount of $7500 provided in RCW 10.88.350, or until legally discharged.

FURTHER, IT IS ORDERED that the defendant shall return to Clark County Courthouse on Monday, July 31, 2006, at 9:00a.m. in the downstairs Arraignment Courtroom for further hearing regarding service of the Governor's Warrant to the State of Wyoming.

39.   The court ought to notice here that both manufactured warrants admit the absence of the Warrants from the Governors of the States of Wyoming and Washington; and hence no power, authority or jurisdiction to "arrest and secure" Plaintiff or set free on bail.

40.   Defendant Second Judicial Circuit Court, acting through the Honorable Judge Robert A. Castor, on December 20, 2005, issued the "Arrest Warrant" that

was used by the named and unnamed Defendant conspirators to "arrest and secure" Plaintiff on May 1, 2006 and again on June 13, 2008.

41.     Defendant Laramie Plains Community Federal Credit Union bounced the checks used to create Counts Two and Three of Defendant Bohling's false and fraudulent Criminal Information when it abruptly closed Events WorldWide's business checking account in an endeavor to bounce checks written by Events WorldWide's chief executive officer without knowledge the account was closed.

42.     Laramie Boomerang, Laramie, Wyoming is responsible for the false light publication on May 20, 2005 in furtherance of the WIA conspiracy.

43.     Casper Star-Tribune, Casper, Wyoming is responsible for the false light publications on May 20, 2005 and June 16, 2006 in furtherance of the WIA conspiracy.

44.     News Corporation and MediaNews Group; 101 W. Colfax Avenue, Suite 1100; Denver, Colorado 80202 is responsible for the false light publication on May 20, 2005 in furtherance of the WIA conspiracy.

45.     The Associated Press, New York, is responsible for the false light publication on May 20, 2005 in furtherance of the WIA conspiracy.

46.     Arthur David Curtis, Prosecutor, Clark County, Washington; condoned all of the wrongful activities of the prosecutors done in furtherance of the WIA conspiracy.

47.     Doe One Battle Ground Police Arresting Officer; is a citizen of the State of Washington and participated in the unconstitutional warrantless arrest of Plaintiff on May 1, 2006.

48.     Doe Two Battle Ground Police Arresting Officer,2006; is a citizen of the State of Washington and participated in the unconstitutional warrantless arrest of Plaintiff on May 1, 2006.

48.     Doe Three Battle Ground Police Arresting Officer, is a citizen of the State of Washington and participated in the unconstitutional warrantless arrest of Plaintiff on June 13, 2008.

48.     Doe Four Battle Ground Police Arresting Officer, is a citizen of the State of Washington and participated in the unconstitutional warrantless arrest of Plaintiff on June 13, 2008.

**V.    The Unlawful Federal Workforce Investment Act Fraud Conspiracy.**

49.    With the aid of lawyers and or legal advocates, the defendants' cause or pretext for plaintiff's two warrantless arrests and unlawful custody and detentions is a false and fraudulent claim that Plaintiff violated her sovereign corporate capacity as the Chief Executive Officer of Events WorldWide (EWW), a Wyoming Corporation, by using company checks written to benefit EWW to commit three counts of check fraud, when in fact the opposite is true.

50.    In 2004, plaintiff was lawfully lured into the State of Wyoming under provisions of the Workforce Investment Act of 1998 (WIA of 1998), Title 29 U.S.C.A. § 2801 et seq., by individuals associated in fact and or employment with the Laramie Economic Development Corporation (LEDC), a local state workforce investment entity mandated by the WIA of 1998.

51.    At the time defendant attorney and City Councilman A. Joe Hageman and divers others commenced their evil directed at plaintiff, the following agents of defendant State of Wyoming and defendant Wyoming Governor Dave Freudenthal were members of the LEDC Board of Directors pursuant to the mandates and covenants of Title 29 U.S.C. § 2801 et seq.:

(1) Timothy Stamp, President, LEDC;

(2) Joel (A. Joe) Hageman; Ex-officio, Ward 5, City Council, City of Laramie; Work Phone: (307) 742-7609, Expiration Date: 1/2009; JHageman@ci.laramie.wy.us

(3) Mr. Bryan Shuster; Laramie City Council, Ward 2; Home Phone: (307) 745-8828; Expiration Date: 1/2011; BShuster@ci.laramie.wy.us

(4) Dave O'Malley; Ex-officio, City Council Member, City of Laramie; Home Phone: (307) 755-0705; Fax: 721-5211; Expiration Date: 1/2009; PO Box C; Laramie, WY 82073; DO'malley@ci.laramie.wy.us; http://www.ci.laramie.wy.us/cityhall/council/contact.html

(5) Mark Collins Ex-officio, City of Laramie, City Manager, (307) 721-5226, mcollins@ci.laramie.wy.us; http://www.ci.laramie.wy.us/

(6) Tom Johnson – Wyoming Business Council, Southeast Regional Director; http://www.whywyoming.org/

(7) Murray Lou Rex, Ex-officio, Laramie Chamber of Commerce; 1267 N. 15th Suite 101 Laramie, WY 82072; Phone: 307-745-8664; Fax: 307-745-8617; E-mail acre@laramiehomes.com;

(8) Mike Peck & Gary Negich – First Interstate Bank; 221 Ivinson Ave.; P.O. Box 1307; Laramie, WY 82073; Phone: 307-721-4600; ttp://www.firstinterstatebank.com/

(9) Kenneth Grunkmeyer; American National Bank; 3908 Grand Avenue; Laramie, WY 82070; 307-745-3619; info@anbbank.com; https://cfdsnet.c1data.net/anbbank/index.html

(10) Dan Furphy – First National Bank; 2020 Grand Avenue or 501 Ivinson Street; P.O. Box 490; Laramie, WY 82070; Phone: (307) 745-7351; Fax: (307) 745-4932; E-mail: fnbwyo@fnbwyo.com

(11) Karen Saunders; The Mortgage Source Inc.; 414 Lewis Street; Laramie, WY 82072; Office: (307) 755-1592; Toll Free: (888) 279 – 4084; E-mail: loans@laramiemortgage.com

(12) John Pope – Welldog, Inc.; 1482 Commerce Drive, Ste. T; Laramie, WY 82070; P: (307) 721-8875; F: (307) 742-0943; info@welldog.com; http://www.welldog.com/

(13) Bill Gern; University of Wyoming; 1000 E. University Ave.; Laramie, WY 82071; (307) 766-1121; http://www.uwyo.edu/

(14) Jack Bedessem, Trihydro Corporation - 1252 Commerce Drive, Laramie, Wyoming 82070; (P) 307/745.7474 - (F) 307/745.7729; https://www.trihydro.com/public/

(15) Jim Cavalli - Aspen Banner Engineering; 409 22nd Avenue South; PO Box 298; Brookings, SD 57006; Phone: (605) 692-6342; Fax: (605) 692-5714; Email: contact@bannerassociates.com; http://www.bannerassociates.com/

(16) Sam Clark – Mountain West Farm Bureau, P.O. Box 1348 Laramie, WY 307-745-4835 http://www.mwfbi.com/

(17) Paul Greaser; The Acre Company; 1267 N. 15th Suite 101 Laramie, WY 82072; Phone: 307-745-8664  Fax: 307-745-8617; E-mail acre@laramiehomes.com; http://www.laramiehomes.com/

(18) Butch Keadle, Insurance Unlimited, Inc.; 568 N 3rd Street Suite 100; Laramie, WY 82072; Phone: 307 745-7447; Fax: 307 742-0765; ins@wyoming.com; http://www.insureunlimited.com/

(19) Michael Kmetz; IDES Inc.; 1604 E. Grand Avenue; Laramie, WY 82070 USA; Phone: 800-788-4668 or 307-742-9227; Fax: 307-745-9339;

(20) Jody Levin – Qwest; 1400 Dell Range Blvd; Cheyenne, WY 82009; 307-634-7821 http://www.qwest.com/default.html

(21) Mark Mader; Mader Tschacher Peterson & Co., LLC; 505 S. 3rd Street; Laramie, Wyoming 82070; Phone: 307-755-1040; Fax: 307-742-4944; Email: info@10-40.com; http://www.10-40.com/

(22) Ray McElwee;  Groathouse Construction; 1050 North Third Street; Suite A, Laramie, WY 82072; 307.745.4119 Telephone; 307.742.7124 Fax; rm@groathouse.com; http://www.groathouse.com/

(23) John Guerin; Coal Creek Coffee Co. www.coalcreekcoffee.com./

(24) Bob Davis - Duane Toro Real Estate; (25) John Dooley - Dooley Oil Company; (26) Pam Dunnuck – Pauline Dunnuck, CPA; (27) John Evans – Energy Ensights; (28) Lou Schilt (Emeritus); (29) John Shuster (Emeritus); (30) Dick Van Pelt (Emeritus); (31) Mark Marquardt (Emeritus); and (32) David Walrath – University of Wyoming.

52.    The aforementioned list of directors show Defendant attorney and City Councilman A. Joe Hageman and certain other members of defendant City Council, City of Laramie, County of Albany, State of Wyoming were associated in fact and or membership, ex officio and or otherwise, with the LEDC, a local state investment entity mandated by federal law.

53.    Unbeknownst to plaintiff, certain individuals and business entities associated in fact and or employment with defendant attorney Hageman, the LEDC and the Laramie City Council were also engaged in the use of a "bait and switch" scheme that illegally rides piggyback on the WIA of 1998. The unlawful fraudulent scheme is further reinforced by ancient traditions associated with tribes, gangs and clans.

54.    Between January 1, 2005 and the time of plaintiff's first warrantless arrest on May 1, 2006, the following individuals and businesses were investors in the LEDC:

Ace Hardware; ACPE Federal Credit Union; ACRE Company; Advantage Real Estate; Albany County; Alpine Animal Hospital; Alvaney Design; Alsco; Altitude Chophouse & Brewery; Alliance Construction; American National Bank; Anderson Construction; Anthony Nicholas Goodrich & Tangeman, LLC; Appaloosa

Broadcasting; Aron & Hennig LLP; Aspen-Banner Engineering; Bank of the West; BioLife Plasma Services; Bloedorn Lumber; Brown & Gold Outlet; Brown & Hiser; Century 21 Associated Brokers; Century 21 Real Estate Center; City of Laramie; ClearChannel Communications; Coal Creek Coffee Company; Coffey Engineering; Walt and Dee Davis; Delta Construction; Dental Arts, PC; Doddsco, Inc.; Dooley Oil Company; Duane Toro Real Estate; Edwards Jones Investments; Espeland Realty; John Evans; Family Mortgage; Farm Bureau Insurance; First Interstate Bank; First National Bank of Wyoming; Fortman's Paint and Glass; Fremont Electric; George & Linda Gault; Gem City Bone and Joint; Groathouse Construction; Guthrie Foundation; Handel Information Technologies; Heather Plumbing; Holland Cleaners; IDES, Inc.; Insurance Unlimited; Ivinson Memorial Hospital; Kalcon Electric; Laramie Chamber of Commerce; Laramie County Community College; Laramie Ford Lincoln Mercury; Laramie GM Auto Center; Laramie Newspapers; Laramie Plains Community Federal Credit Union; Laramie Physician for Women and Children; Laramie Regional Airport; Lovejoy 's Bar & Grill; Lincoln Printing Co.; Lonesome Dove; Mader Tschacher Peterson & Co.; Greg McCarty Honda; Modern Printing; Mountain Cement; Mountain Valley Properties; Mountain West Farm Bureau; Mullen's Heating; Gary Negich; Orrison Distributing; Pacific Power; Pauline M. Dunnuck, CPA; Mike Peck; Pence & Macmillan, LLC; John Pope & Jaime Johnson; Pepsi-Cola; Powell Enterprises; Powell Title & Escrow Co.; Prehoda, Leonard, and Janack, LLC; Qwest; Realty Executives; Rocky Mountain Forest Products; Lou Schilt; John & Shari Shuster; Security First Bank; Snowy Range Ski Area; Snowy Range Graphics; Smith Beverages; Star Awards and Signs; State Farm Insurance Agent Scott McFarland; SMU, LLC; Strube Construction, Inc.; Summit Structures, Inc.; Swift Structures; TRC Mariah Associates; Thaxton Insurance Agency, Inc.; Tommy Jack's Cajun Grill; The Brick Bed and Breakfast; The Home Bakery; The Mortgage Source Inc.; Trihydro Corporation; True Value Hardware Of Laramie; University of Wyoming; UNIWYO Federal Credit Union; US Bank; Wal-Mart; Dr. Dave Walrath; Welldog Inc.; West Laramie Fly Store; Western Research Institute; Winger's; Wyoming Office Solutions; Wyoming State Bank; and Young Appraisals.

55.    The aforementioned investors and directors constitute a formidable legal conspiracy, companionship, professional association and financial empire when compared to the population of around 25,000 citizens. Constituted as such, every business financed under the WIA of 1998 ought to flourish, not flounder, unravel and be destroyed like EWW was destroyed and is now being harassed and its chief officer illegally prosecuted and imprisoned.

56.     The Workforce Investment Act (WIA), 29 U.S.C.S. § 2801 et seq., is intended to provide workforce investment activities, through statewide and local workforce investment systems, that increase the employment, retention, and earnings of participants, and increase occupational skill attainment by participants, and, as a result, improve the quality of the workforce, reduce welfare dependency, and enhance the productivity and competitiveness of the nation. 29 U.S.C.S. § 2811.

57.     To be eligible to receive federal funds under the WIA, a State must submit a State Plan outlining a five-year strategy for the statewide workforce investment system. The WIA directs the Governor of each state to establish a state Workforce Investment Board (WIB) to assist in the development of the State Plan.

58.     Mandatory members of the WIB consists of the Governor, two members of each chamber of the state legislature, and representatives appointed by the governor, including representatives of business, chief elected officials of municipal and county governments, representatives of labor unions, individuals or representatives of organizations that have experience with youth activities and education, and state agency officials with responsibility for related programs and activities. 29 U.S.C.S. §§ 2821-2822.

59.     The Wyoming Department of Workforce Services was created under Wyo. Stat. Ann. §§ 9-2-2018 and 9-2-2601 to implement all requirements of the federal Workforce Investment Act of 1998.

60.     The Wyoming Workforce Development Training Fund (WDTF) was established under Wyo. Stat. Ann. §§ 9-2-2601(d) and 9-2-2604 to administer federal funds provided to the state treasurer to carry out the policies and goals of the WIA of 1998.

61.     Events WorldWide was obligated $4.4 million under the WIA of 1998 in five federal contracts.

62.     Because EWW's grant applications for pre-Obligation of WDTF funding exceeded $20,000.00, the LEDC and the Wyoming Business were by federal law under the WIA of 1998 required to and did approve all of EWW's grant applications submitted to defendant State of Wyoming.

63.     Members of the LEDC generally portrayed plaintiff as an upstanding corporate officer and worthy of business trust. Plaintiff and the $4.4 million of funds federally obligated to Events WorldWide were paraded around the City of Laramie by LEDC Board member-banker Gary Negich similar to the manner the Clampetts were paraded around Beverly Hills by Mr. Drysdale and Ms. Hathaway.

64. While chasing after EWW's $4.4 million, on no less than two occasions, LEDC Board member-banker Gary Negich brought big bags of bagels to plaintiff's office and invited plaintiff to exclusive social functions. Mr. Negich currently serves on the Wyoming Business Council under the direct management, control and supervision of defendant Governor Dave Freudenthal.

65. Events WorldWide's first federal WIA contract, No. 05-0399 in the amount of $28,000.00 was properly funded and encountered no glitches. However, the funds were deposited into Wells Fargo Bank, Battle Ground, Washington, and not LEDC director Mr. Negich's First Interstate Bank in Laramie.

66. Plaintiff believes this banking decision directly led to EWW's immediate and future problems with Tim Stamp and certain other members of the WIA fraud conspiracy; the members of the IECFC; and the commencement of this civil rights complaint.

67. The LEDC President, Tim Stamp, implied to plaintiff during the initial phases of business developments in Laramie that the LEDC would be counting on the federal money transfers to be deposited locally in a bank controlled by one of the directors of the LEDC.

68. After the funding of the first contract, EWW opted to do local banking business with defendant Laramie Plains Community Federal Credit Union (LPCFCU), who was an investor in the LEDC but not a member of the board of directors as was implied by Tim Stamp.

69. While this banking arrangement was at odds with what Tim Stamp and the LEDC directors wanted, the arrangement would later put LEDC investor LPCFCU and one of the LEDC's directors, defendant attorney and City Councilman A. Joe Hageman, at odds with LEDC investor-law firm Prehoda, Leonard, and Janack, LLC.; the check defendant Hageman used to falsely create Count One; and the Albany County Bar Association.

70. The LEDC investor-law firm Prehoda, Leonard, and Janack, LLC. is prominent in this action in the following way:

> Laurie H. Edwards Janack, who authored the legal opinion and "settled" the matter in Count One adverse to defendant Hageman's clients, is also President of the Albany County Bar Association, Past-President of the Kiwanis Club of Laramie and is a member of Soroptimist International of Laramie.

Robert H. (Bob) Leonard's community memberships include the Laramie Chamber of Commerce (an LEDC investor) and the Laramie Economic Development Corporation.

Donald P. Prehoda, Jr. is also a member of the Laramie Chamber of Commerce and the Laramie Economic Development Corporation.

71.    Mr. Mike Martin's WIA fraud conspiracy, intentional or otherwise, is best viewed from the scheme governing the disbursement of the federal funds obligated to EWW:

72.    Wyoming Business Training Grants for New Positions can provide between $1,000 and a maximum of $4,000 per trainee per fiscal year and were developed to assist Wyoming businesses in two ways: business expansion and new business recruitment.

73.    The grants are designed to cover the following allowable training expenses:

Trainee's wages;
Tuition, registration, class fees, and class materials;
Travel expenses including transportation, lodging, and meals;
Instructor fees and travel expenses; and
Fees for continuing education units and certifications that may be obtained during the training.

The business will initially receive 75% of the total grant award. This initial payment request will be forwarded to the State Auditor's Office for disbursement within 3 business days after the signed and dated contract has been approved by the Department of Workforce Services. The remaining 25% is retained until the Department of Workforce Services receives and processes the final report, ninety (90) days after the completion of the training.

See Document No. 10, page 101 at http://www.emccray.com.

74.    Delaying the prompt allocation of initial funds and or reducing the amount of the initial 75% directly increases the 25% automatically delayed until 90 days after the completion of training.

75.    The aforementioned scheme necessarily increases a business' expenses for which the federal funds were designed to cover. Every day of delay causes financial harm to the business by causing the business to use its capital to "front" the delay.

75.     Whether intentional or unintentional, this was the scheme utilized by Mr. Mike Martin that directly caused EWW to encounter financial difficulty in paying its employees, among them was plaintiff.

76.     The aforementioned unlawful scheme is the direct and proximate cause of EWW's failure. Defendant LPCFCU's no notice closure of EWW's business checking account directly aggravated EWW's financial situation that was bound to occur without defendant LPCFCU's unlawful assistance.

77.     It was not plaintiff's mismanagement that caused EWW to unravel; rather it was Mike Martin's management fraud or negligent maladministration fraud that caused it all, and it manifested itself this way:

78.     In a letter dated February 18, 2005, Michael P. Martin, Program Manager, Business Training and Outreach (BTO), Wyoming Department of Workforce Services (DWS), defendant State of Wyoming, informed Events Worldwide (EWW), through plaintiff, of a favorable outcome to a pending contract (Contract No. 3), to wit:

> "Re: WDTF Contract No. 05-0566
>
> Dear Ms. Hust:
>
> On December 20, 2005 (sic),[1] an application for a grant from the Wyoming Workforce Development Training Fund was submitted on behalf of Events WorldWide, Inc., d/b/a Health Management WorldWide. The application has been reviewed based on the criteria established for this program and the availability of funds.
>
> The Department of Workforce Services has approved $27,000.00 to provide specialized training for ten (10) employees(s)."

79.     On March 16, 2005, EWW, through plaintiff, in an email, complained to defendant State of Wyoming's agent Mike Martin, Assistant Administrator, BTO, DWS about the undue delay regarding receipt of funding for a second contract, to wit:

> Dear Mr. Martin,
>
> I am inquiring about an approved grant application signed by Ms. Emmons on February 18th, 2005. I understand that funding takes place shortly after the signing of the contract, and it has now been

---

[1] December 20, 2005 would become the date defendant prosecutor Richard C. Bohling filed his alleged false and fraudulent Criminal Information before the Honorable Judge Robert A. Castor.

approximately over four weeks. I realize things get hectic and there might be an oversight, please notify me when the check will be ready for me to pick up.

Do you have any news regarding the third contract? The training starts on Monday March 21st, 2005.

80.   On March 16, 2005, Mike Martin responded in part:

"Ms. Hust,

I plan to make a decision by tomorrow morning about the second grant application and will let you know by email the outcome."

81.   On March 17, 2005, Mike Martin, in an email, responded in part:

"Dear Lynn,

I am happy to tell you that I am sending the second contract for training for Events Worldwide, Inc. doing business as Health Management Worldwide to our fiscal department for processing. You should receive an electronic deposit for 75% of the contract amount into your bank account within five business days.
***
Regarding the third application, we need to discuss how to proceed. Peter Reis mentioned the possibility of splitting the third contract into smaller segments. I believe this is a good idea and will allow us to move forward in a more structured manner."

82.   This funding delay by Mr. Mike Martin caused EWW to postpone hiring several employees previously approved for funding by DWS under the WIA of 1998.

83.   In a letter dated March 28, 2005, Angela Espinoza, Employment Specialist, Laramie Workforce Center informed "DWS ES Division", Joe Perkins, SE Regional Manager and Margaret Blodgett, Laramie Manager, that Events WorldWide was postponing training indefinitely:

"To Whom It May Concern:

As provided to all employers in Albany County, the Laramie Workforce Center provided the use of office space to Lynn Hust of Events WorldWide for interviewing purposes.
***

The Laramie Workforce Center received from Lynn Hust on February 11, 2005 a list of names of individuals hired from the interview process....This is a total of 59 individuals on the list of hires provided by Ms. Hust.

The Laramie Workforce staff has had several individuals report to this office that they have already quit their current employer intending to begin on the start date but in the interim, received notification from Events WorldWide staff that the start date of employment has been postponed indefinitely due to Administrative issues."

83.    On or about March 28, 2005, plaintiff, on behalf of Events WorldWide gave official notice to the employees scheduled to be hired which, included the following statement:

"We regretfully announce that the positions that we have hired you for to start in the very near future have been canceled....The State of Wyoming, recognizing the need for higher paying jobs, promised to subsidize some of our training cost....The State of Wyoming (the Department of Workforce) has pulled away from this promise, therefore forcing us to re-evaluate the high training cost, and put jobs on hold for now."

84.    Plaintiff contends that the schemes for "splitting the third contract into smaller segments" and the "move forward in a more structured manner" are key components of the "bait and switch" conspiracy that is used to seize control of businesses financed under the WIA of 1998. Plaintiff resisted this illegal hostile takeover of Events WorldWide.

85.    Concealment of these contract irregularities is the driving force behind the conspiracies to gain custody of plaintiff's person in an endeavor to silence a federal whistleblower.

86.    In April 2005, plaintiff presented evidence to defendant Governor Dave Freudenthal's agents, Mr. Sam Western and Mr. Dave Teubner, regarding Mr. Mike Martin's unlawful efforts to force the failure of Events WorldWide by withholding or delaying obligated federal funding in an amount designed to cause the immediate destruction of Events WorldWide.

87.    The knowledge gained by Mr. Sam Western and Mr. Dave Teubner as to the true state of affairs regarding the unlawful efforts to force the failure of Events WorldWide is the knowledge of defendant Governor Dave Freudenthal; who is by law, the Chief Administrator of Wyoming's federal workforce funds and is the immediate supervisor of Mr. Western and Mr. Teubner.

88.   By allowing the WIA continuing fraud conspiracy to operate with impunity, defendant Governor Dave Freudenthal breaches the covenants of Title 29 U.S.C. §§ 2801 et seq.

89.   Moreover, Mr. Mike Martin continues to be employed by defendant State of Wyoming under the supervision and management of defendant Governor Dave Freudenthal.

90.   In December 2007, the Wyoming's Joint Minerals Committee sponsored the Challenge Loan Bill to increase funding of the Wyoming Partnership Challenge Loan Program by $20 million to help businesses grow by reducing the interest rate on their loan.

91.   During this December meeting, Mike Martin, now the Portfolio/Loan Program Manager under the Business and Industry Division of the Wyoming Business Council (WBC.) stated:

"Adding $20 million to the Wyoming Partnership Challenge Loan Program would allow the pro-gram to become self-sufficient."

"We anticipate that additional participation requests will exceed $3 million in fiscal year 2008 totally depleting the fund unless this additional appropriation is approved."

92.   Also during this December meeting, the Wyoming Attorney General's Office confirmed that legislation for additional appropriations for the Challenge Loan Program must be separate from the budget bill.

93.   At a June 11, 2008 Wyoming State Committee hearing, Mr. Jensen, Mr. Reese and Mr. Mike Martin, Portfolio Loan Manager for the Challenge Loan Program, explained the various programs managed by the Wyoming Business Council. They expressed a need for additional funding for the Challenge Loan program and explained the effects of the cut from the original funding request of $18 million to the final amount of $2 million.

94.   The WIA "bait and switch" continuing conspiracy included a common plan for secrecy and concealment. In an endeavor to maintain the secrecy of the WIA "bait and switch" continuing fraud conspiracy and to further conceal the true circumstances regarding the failure of EWW, Mark Hawkins, Program Manager, BTO, DWS, issued a series of letters designed to cause the appearance that DWS was managing this federal program in a responsible manner. One of which, dated October 6, 2005, involved contract No. 05-0399 (first federal contract):

"Re: Workforce Development Training Fund Grant for $28,000.00
Contract No. 05-0399

Dear Ms. Hust:

The Department of Workforce Services awarded Events
WorldWide, Inc. a grant of $28,000.00 from the Workforce
Development Training Fund to provide training for your employee(s)
during the period of February 14, 2005 through June 6, 2005. As of the
date of this letter, you have not submitted the required report.

Please submit the following by October 21, 2005:
***
Until this final report is received and the account is settled, you will be
ineligible for any future grants. If the report is not received by October
21, 2005, the matter will be turned over to the Wyoming Attorney
General's office for appropriate action...."

95.      Plaintiff contends this report is a product of fraud in light of the fact that: (a)
the conspirators effectively caused the breach of all federal contracts in May 2005;
(b) an immediate investigation of the breach of contract pursuant to the WIA of
1998 would have reconciled the contracts in favor of EWW and plaintiff, its chief
officer; (c) the investigation would have discovered the scheme to cause the failure
of EWW; (d) the disposition of the investigation would have rendered it unnecessary
for Mark Hawkins to issue the series of letters in may and September 2005; and (e)
the investigation would have uncovered the conspiracies to retaliate and silence
plaintiff's speech in the form of whistleblowing.

96.      The fraud in the aforementioned letter is further made apparent by a news
article created by the partners in the WIA continuing fraud conspiracy to conceal
their role in causing EWW to breach its WIA contracts with the Federal
Government and EWW's employees, including plaintiff (numbered for ease of
reference):

Filed by Laramie Boomerang Staff Writer, Micah Sturr;[2] *Laramie
company unravels*, Story Published on 5/20/2005;
http://www.laramieboomerang.com/news/archivemore.asp?StoryID=10
3376

#1. Events WorldWide has local problems. The new Laramie company
has unraveled in May, leaving embittered employees with rubber
checks or no pay at all. (See #4 below: "one paycheck bounced".)

---

[2] Reach Micah Sturr at: 1-877-452-3789; 1-307-742-2176; 1-307-742-2046 (fax)

**#2.** At the heart of the company is Lynn Hust, and a great deal of employee rancor is directed at the woman who they say lied, manipulated and eventually absconded with their pay.

**#3.** "She said we were all hand-selected, and I'm sure we were," former marketing representative Linda Staley said.

**#4.** Some employees said they received partial checks for work they had done, some received no checks and at least one paycheck bounced for work done in the last month of Hust's business's (sic) operation. (See #1 above: "rubber checks" vs. one paycheck.)

**#5.** All can file wage grievances and pursue their lost pay in civil court, but whether the company's collapse is the result of ham-fisted management, criminal conduct or simply market forces is uncertain.

**#6.** Laramie Police Department Sgt. Gwen Smith said that Hust has left town and that complaints against her have been brought to the police department, but she couldn't go into more depth because an investigation is ongoing.

**#7.** "There is the potential that it will turn criminal, if she intentionally defrauded these people," LPD Commander Dale Stalder said. "At this point it's primarily civil. But if she told these people she would repay them if they put charges on their own credit cards for airline travel, for example, it could become criminal."

**#8.** If the company fell apart legitimately, the only recourse the more than 20 employees affected have is to file wage claims, which are not criminal. Hust could not be reached and is not in Laramie.

**#9.** "In all of the years I've done this, I've never seen a police report on a wage claim," County Attorney Richard Bohling said.

**#10.** Hust's management could also be criminal if she defrauded the government, Stalder said.

**#11.** Events WorldWide began hiring employees in Laramie in early 2005 to market health and benefits fairs to companies. The fairs are designed to bring health-care providers ranging from massage therapists to nutritionists and laser eye surgery providers to employees. Events WorldWide contacted companies to host the fairs and also sold display tables at the fairs to businesses.

#12. As a start-up business, Events WorldWide and its founder, Hust, had access to several state and local organizations that support entrepreneurs and promote business growth.

#13. The Laramie Economic Development Corporation began working with Hust in the fall of 2004 and helped her make business contacts in the area.

#14. "She came to LEDC and asked for help in starting this business. We gave her some ideas about finding a location, and assistance in getting training grants like we would with any other business," LEDC president Tim Stamp said.

#15. "We try to provide these services to any company who wants to grow their business and improve the economy in Laramie," Stamp said.

#16. The LEDC hasn't had any contact with Hust in several months, Stamp said, and he declined to comment further on Hust or Events WorldWide.

#17. The training grants that LEDC helped Hust access were from Wyoming Workforce Services' "Workforce Development Training Fund." They totaled $2,000 to $4,000 per employee and were given to pay for salaries and training, Mike Martin Assistant Administrator for Business Training and Outreach for Wyoming Workforce Services said.

#18. "The training fund has done so many good things for Wyoming businesses and it's unfortunate that this business didn't work," Miller said.

#19. "They didn't get preferential treatment and they didn't get shunted. We provided the same services that we would to any other business," Miller said.

#20. The grants have helped 236 Wyoming business since July 1st, and assisted with the training of more than 2,400 employees around the state, Miller said.

#21. Miller also pointed out that even well-established business (sic) fail and that it is premature to form conclusions about Events WorldWide.

#22. Many of the employees who have bills to pay and children to feed have formed the conclusion that they were victimized and mislead (sic).

#23. "You'd think the boss would have enough respect for you and enough decency to tell you what's going on, even if she can't pay you," former marketing representative Crystal Short said.

#24. "I'm just getting the runaround from everybody. I don't know what's going on. I want my money. I want my paycheck," Short said.

#25. Unlike many other employees who got either partial paychecks or bad checks, Short didn't receive a check at all for the pay period prior to May first because she was on vacation. She also hasn't been paid for her work from the first to the fifth, when employees were told to stop coming to work. She has filed for wage recovery.

#26. Similarly, chiropractor Lauren Hoffman moved to Laramie from California and was working for Events WorldWide while she sets up a practice. She hasn't been paid the more than $400 she earned between the first and the fifth.

#27. Hoffman said she went to get a paycheck after Hust was "out of town" on payday — Friday the sixth. Once Hoffman and a few other employees cornered Hust, they were told that they could get their checks but that other employees wouldn't be paid if they did. Most opted for partial checks instead, Hoffman said.

#28. "If she'd been an honest business that went under I wouldn't have done anything. But since she lied to us, I want to help so this doesn't happen to anyone else," Hoffman said.

#29. To compound the feeling of betrayal, Hoffman, and several other employees waited three weeks for the business to begin before they started work. The wait was calculated to make employees dependent on Hust, Joseph Wayman, a graphic artist who was hired to do art but put to work as a salesman, said.

#30. For all of the acrimony felt by many employees, former corporate representative Blain Fisher said that the majority of startup companies fail and he was well aware of the risks when he took the job.

#31. "I don't feel scammed. I don't know what's true and what's not true. But I knew I probably wasn't going to be there in a year," Fisher said.

#32. Fisher said he sympathizes with employees, especially those with children, who were unpaid for their work, but that getting another job to recoup the money is more constructive than legal wrangling.

#33. "I realized from the get go that it was a start up and it was risky. Anyone who knows start-ups knows that there is risk when you jump on board," Fisher said.

97.    Some of the principal conspirators are all present in this news release: Tim Stamp, President LEDC; defendant Laramie Police Department Sgt. Gwen Smith; defendant County Attorney Richard Bohling; and Mike Martin, State agent for defendant Governor Dave Freudenthal.

98.    Defendant attorney and City Councilman member A. Joe is an ex officio member of the LEDC Board of Directors. Both share a common understanding of the truth regarding the failure of EWW and the Count One check and are to be charged by the court with having such knowledge.

99.    Moreover, the presence in the news article of the voice of Mike Martin, State Capitol agent for defendant Governor Dave Freudenthal, mutes the voices of Laramie Manager Margaret Blodgett and Angela Espinoza, Employment Specialist, Laramie Workforce Center[3] who assisted EWW and plaintiff in hiring and interviewing individuals for employment training under the WIA of 1998.

100.   Stated differently, Mike Martin immediately knew the seriousness of the failure of EWW and his role in causing the failure and used his power to prevent the local workforce office from telling the public what it knew was the truth.

101.   Here also, the court ought to find the local press excluding from the news report information available from Blodgett and Espinoza at the local workforce office and the central role it played in providing services to EWW and plaintiff, its chief officer.

102.   Under the scheme of the WIA 1998, Mike Martin was defendant Governor Dave's State Capitol agent and Tim Stamp was defendant Governor Dave's local area agent. Laramie Manager Margaret Blodgett and Angela Espinoza were defendant Governor Dave's direct agents under the DWS. The official letterhead for these agents is set as follows:

State of Wyoming

---

[3] Laramie Workforce Center, 112 S. 5th St., Laramie, WY 82070 (307) 742-2153.

Department of Workforce Services
Office of the Director
Director Kathy Emmons          Governor Dave Freudenthal

Laramie Workforce Center
112 S. 5th St.
Laramie, WY 82070
(307) 742-2153

103.   The principal conspirators, Stamp, Smith, Bohling and Martin, all knew why
and how EWW unraveled and that Stamp, Martin and divers others conspired to
caused the failure of EWW. These conspirators were the investigation that
Governor Dave and the Wyoming Attorney General were required to present to
federal authorities.

104.   In paragraph #17 above, Mike Martin clearly withholds from the public his
personal knowledge regarding the true failure of EWW and his involvement. Mark
Hawkins, author of the October DWS letter, is from the same office as Mark
Hawkins. This in turn would make it impossible for Tim Stamp, Mike Martin and
Mark Hawkins to be ignorant of the demise of a federal contractor that was
obligated and approved $4.4million federal by their offices.

105.   The investigation and reporting mandated under the WIA of 1998 would have
eliminated the need to issue letters such as the October 2005 letter requesting
EWW reconcile contract funds or risk not receiving more funds and the matter
being reported to the Wyoming Attorney General.

106.   The above news article uses the word "criminal" five times (#s 5, 7, 8, and 10).
This was propaganda designed to vilify and debase EWW and plaintiff and to lull
the public into the security that plaintiff had committed crimes and that defendants
Gwen Smith and Richard C. Bohling were on top of things, when in truth and fact,
the exact opposite was true.

107.   The news article also exposes the early involvement of defendants Gwen
Smith and Richard C. Bohling in their plans to pursue a malicious prosecution.

108.   Tim Stamp and divers others made EWW and plaintiff appear as demons to
their subordinates as evidenced by the employees' active and vehement enmity,
hatred and ill will described by the news article.

109.   On June 22, 2005, one month after EWW and plaintiff were forced to
permanently depart the City of Laramie for fear of her life by individuals associated
in fact and or employment with the LEDC, LEDC Director John Pope released the

following statement regarding the LEDC award he presented to his company in his role as a Director of the LEDC:

> "True Entrepreneurial Spirit Earns WellDog Business of the Year Award
> FOR IMMEDIATE RELEASE
> WELLDOG, INC.
> Laramie, WY, June 22, 2005 — WellDog, Inc., a Wyoming-based energy technology company, has been awarded the 2005 Small Business of the Year Award by the Laramie Economic Development Corporation (LEDC).
>
> LEDC, an investor-based, non-profit organization dedicated to growing jobs in the Laramie area, accepts nominees for the award from the member businesses. The final vote is conducted by the 28 members of the Board of Directors. Criteria for the award includes: businesses in operations for two years or more who have made a contribution to the community as well as experienced favorable improvement in number of employees, revenues and financial condition. Additionally, LEDC looks for companies who have shown advanced entrepreneurial skills through innovation.
>
> "WellDog is really the 'poster child' for the type of company we feel represents Laramie's continued economic development," said Timothy Stamp, president of LEDC. "We partnered with WellDog almost five years ago and have been impressed with their growth and development. We see them as a company that will not only advance technology in the natural gas industry, but also as one that provides an environmentally friendly service—that is an unusual combination."
>
> "Our board thinks very highly of WellDog," said Gary Negich, chairman of the LEDC board and president of First Interstate Bank in Laramie. "They started as someone's great idea with nothing to go on but brains and hard work. It was germinated here and came from the University of Wyoming. For us, they represent what can happen if you come to Laramie. They are true entrepreneurs — and even in their early stages they were heavily involved in economic development."

http://www.welldog.com/NewsRoom/PRDetail.aspx?Page=NewsArchive.aspx&KeyValue=36

110.   LEDC director John Pope makes clear to the public and other businesses that if the LEDC game is played, the individual and entity is handsomely rewarded for loyalty to the LEDC's "social cell" and culture or suffers a wrath of ancient origin

that includes illegal extradition and rendition. Additionally, WellDog is an LEDC investor.

## VI.    The April 2005 Unlawful Agreement Entered Into By and Between Defendant Attorney and City Councilman A. Joe Hageman, Tim Stamp and Divers Others In Furtherance of the Unlawful Workforce Investment Act Conspiracy.

111.   One of the primary purposes of the April 2005 unlawful agreement was to assist Tim Stamp, President of the Laramie Economic Development Corporation (LEDC) and divers others in preventing the disclosure to the Federal Government the unlawful conspiracy riding piggyback on the Workforce Investment Act of 1998 (WIA 1998), Title 29 U.S.C. §§ 2801 et seq., in violation of the Omnibus Clause of Title 18 U.S.C. § 1503.

112.   Approximately one week after plaintiff had exposed the unlawful withholding of federal funds by Mr. Mike Martin, plaintiff was threatened in a parking lot in the City of Laramie by Tim Stamp that the unlawful WIA cabal would get even. At the time of the threat, Tim Stamp was serving as the President of the LEDC.

113.   During April and May of 2005, certain members of the unlawful WIA circulated rumors that Events WorldWide was going bankrupt. This caused a mutiny among certain employees and forced Events WorldWide to break its two-week old lease agreement with Chandler Properties in May 2005. This involuntary breach of contract transformed the rent due into prorated rent and not the full rent claimed by defendants Bohling and Smith.

114.   On May 15, 2005, members of defendant Laramie Police Department visited plaintiff's Laramie City home to gather intelligence regarding the success of the conspirators in causing the failure of Events WorldWide and to discover Plaintiff's plans after the failure of Events WorldWide.

115.   On May 16, 2005, defendant Laramie Plains Community Federal Credit Union, abruptly, and without any advance warning, closed the business checking account of Events WorldWide; resulting in two checks being bounced by defendant credit union in an endeavor to aid and abet the WIA conspirators seeking to prevent the disclosure to the Federal Government of the unlawful conspiracy riding piggyback on the Workforce Investment Act of 1998, Title 29 U.S.C. §§ 2801 et seq. by falsely acquiring custody of plaintiff's body and falsely prosecuting plaintiff for crimes of felony check fraud.

## VII.    Defendant Attorney City Councilman A. Joe Hageman's "Evil" Client Dale E. Harper.

116.   On May 22, 1996, a construction crew that was installing a fence east of Highway 30 outside of the City of Laramie discovered a dead body in a ditch near their work site.

117.   A Laramie pathologist later determined that the victim had died as a result of a close range shotgun blast to the back of the head.

118.   Defendant attorney and City Councilman A. Joe Hageman's client Dale E. Harper and the victim were partners in the distribution and sale of cocaine in Laramie and Colorado. James Mayo (Mayo), one of their customers, resided in Laramie and was often "fronted" cocaine.

119.   On May 21, 1996, Mayo sent a $2,000.00 money order to Harper in Colorado via Western Union, as partial payment for the cocaine "fronted" on May 17, 1996.

120.   Between noon and 12:30 p.m. on May 22, 1996, the victim drove his silver 1985 Toyota Tercel to Harper's residence at the Silver Spruce Motel in Glenwood Springs, Colorado. Within a short time, Harper left his residence driving the victim's car, while the victim stayed at the motel to visit with Harper's two daughters, AH and FH. Harper went to the Safeway Store in Glenwood Springs where he picked up the $2,000.00 wired to him by Mayo the previous day. After he obtained that money, Harper went to Center Drug, where he purchased a .410 gauge shotgun and a box of three-inch shotgun shells. He then crossed the street and purchased a hacksaw at the True Value Hardware Store. Around 3:00 p.m., Harper returned to the motel, and he then left with the victim in the victim's automobile for a trip to Laramie. At approximately 8:00 p.m., Harper arrived at Mayo's home driving the victim's silver 1985 Toyota Tercel. Harper delivered another ounce of cocaine to Mayo, and reminded Mayo that he still owed Harper money from the previous drug transaction. After he left Mayo's residence, Harper called a friend in Laramie, at approximately 8:30 p.m., to invite the friend to meet him for a drink at a local bar. The friend declined Harper's offer to meet for a drink, and Harper returned that evening to Glenwood Springs. Harper arrived alone, on foot, at the Silver Spruce Motel in the early morning hours of May 23, 1996. Harper had the victim's black bag containing cocaine and a sawed-off shotgun. Police later recovered the victim's silver 1985 Toyota Tercel from the parking lot at the Ramada Inn Hotel, located about one block from Harper's motel.

121.   Harper was charged with one count of murder in the first degree. In *Harper v. State*, 1998 WY 169, 970 P.2d 400, the Court wrote:

122.   In arguing Harper's case to the jury, the prosecutor [Cal Rerucha] uttered several comments that alluded to the discrepancy in the stories that Harper's two daughters and one of their friends gave to an investigator for the defense, as

compared to their testimony at trial relating to Harper's whereabouts on May 22, 1996.***

123. In making reference to these conflicting stories, the prosecutor stated during closing argument:

> [J.K.] testified in court that she helped in establishing a false alibi for the Defendant Harper to lead police in other directions. Why did they do this? They did this because they had a relationship with Harper. They were trying to help Harper, but when the presence of Harper leaves and he's in jail for six months, you can see the pressure is off and they can come into court and testify truthfully as to what happened at that time and day.
> * * *
> * * * [A.H.] established a false alibi with [J.K.] and another woman so that she could protect her father. Once her father is away from her, once that she has the chance to get adjusted and live a somewhat normal life, she came into court and testified very strikingly, very courageous, and as the truth * * *.
> * * *
> After [F.H.] concluded her testimony, I asked do you love your father. She loved her father and she began to weep. But what she told you was the truth. * * *
> * * *
> * * * Again how should we judge that testimony? What reason would these girls have to possibly lie? They have feelings for their father, but those feelings are not again shrouded by the evil presence of the Defendant and they are able to testify truthfully in this court.
> * * *
> * * * Now we've told you time and time again that these people have gotten together. They established an alibi. Then when they did not have the pressure of the Defendant bearing upon their back, then they told you the truth. * * *
> * * * And that was at the time that the police officer stopped him [Harper], or in the second situation in which [the investigator for the defense] and [the defense counsel] got together and talking about the original statements of the girls, which they came to court and said that wasn't true. We love our father and we wanted to help him at that time. But now we're going to come into court and give you the truth. And that is what has been done and that is what we have offered for you.
> * * *

In his last specific claim of impropriety, Harper contends that the prosecuting attorney made improper comments concerning Harper's

character which asserted facts that were not in evidence. Harper points with particularity to these statements by the prosecutor:

> Now, [defense counsel], in his opening remarks, indicated that there would be tremendous pressure on these witnesses by the State that causes them to testify in a certain way. I would ask the jury if you'd keep in mind the tremendous evil presence of Dale Harper. He is a man that can suck out the good. He can suck out what is true from anybody he comes in contact with. He can take what is good and turn it into something evil in a matter of moments.
> ***
> In a vein similar to [James v. State, 888 P.2d 200 (Wyo. 1994)] and Tennant v. State, 786 P.2d 339 (Wyo. 1990), we hold that the prosecutor's comments that Harper has an "evil presence," while unprofessional, did not rise to the level of plain error. We cannot fail to note that the record demonstrates: (1) Harper took the money provided for his youngest daughter's home schooling and used it to buy cocaine; (2) Harper smoked cocaine routinely with his daughter's seventeen year-old friend; (3) Harper used his children to help him dispose of his bloody shoes after the murder; and (4) Harper shot the victim in cold blood in the back of the head. Perhaps the argument of the prosecutor about an evil presence was not far from the mark."

124.    At the conclusion of a jury trial, defendant Hageman's client Dale E. Harper was found guilty of murder. On December 17, 1996, an Order Upon Jury Verdict was entered, and Harper was sentenced to a life term of imprisonment in the Wyoming State Penitentiary. See Document No. 57 at http://www.emccray.com.

## VIII.  Defendant Attorney City Councilman A. Joe Hageman Asserts the Fifth Amendment In the Murder Trial of His "Evil" Client Dale E. Harper.

125.    On August 11, 2002, Angela Brooks, an agent for defendant Laramie Boomerang wrote in part:[4]

> But even though Hageman has not listed his personal grievances on the Web site, he does have a story to tell. That incident dates back to 1996 during the Dale E. Harper case. Hageman testified during the case because his former client of 10 years, Harper, was being tried for first-degree murder for an execution-style death that occurred on U.S. Highway 30. Hageman said that Rerucha's temper exploded during the trial, and things have not been the same since.

---

[4] *Group campaigns against county attorney*, published on 8/11/2002, by Angela Brooks, Boomerang Staff Writer.

An official transcript reveals that at one point during the trial, Rerucha accused Hageman of purchasing illegal drugs from Harper and being an accessory to murder. That was, Rerucha said, the extent of their relationship in the first place. Hageman said his legal relationship with Harper fell under the attorney/client privilege, which forbade him to reveal certain information in the case. That caused Rerucha's temper to explode, he said.

"Cal told the judge that the attorney/client privilege shouldn't stand in a homicide prosecution," Hageman said. "And then, with no evidence whatsoever, he decided to accuse me of being an accessory to murder."

According to the transcript, that accusation ultimately led Hageman to assert the Fifth Amendment, bringing his testimony to an end.

See Document No. 59 at http://www.emccray.com.

IX.   Defendant Attorney City Councilman A. Joe Hageman Accuses Albany County Prosecutor Cal Rerucha of Tampering With the Crime Computer.

126.   On August 11, 2002, Angela Brooks, an agent for defendant Laramie Boomerang further wrote in part:[5]

But that's not the end of the story. Rerucha attempted to have Hageman thrown out of the court when he returned to listen to closing arguments, Hageman said. Hageman voluntarily complied by leaving, even though the judge said he could stay. A few days after the incident, he said a Highway Patrol officer pulled him over for speeding while he was traveling to visit relatives for Thanksgiving.

Hageman said his vehicle remained on the roadside for nearly two hours, for what should have been a routine stop. At one point the trooper drew his weapon and asked Hageman to get out of the vehicle, he said.

"I had no idea what was going on at the time," he said. "It was quite a surprise to me."

A few days later Hageman discovered that he was listed in the Wyoming Crime Information Computer System.

"As I recall, it was a code zero, armed and dangerous," he said.

---

[5] *Group campaigns against county attorney*, published on 8/11/2002, by Angela Brooks, Boomerang Staff Writer.

Hageman said someone had apparently reported him as being visibly upset at the Harper trial, which triggered that status. He said someone from the county attorney's office was behind the incident.

127. The same Wyoming Crime Information Computer System (CICS) defendant attorney and City Councilman A. Joe Hageman accuses Albany County prosecutor Cal Rerucha of using to plant false evidence against him was used by defendant Hageman and divers others on December 21, 2005 to plant a false and fraudulent extradition warrant to support the alleged false and fraudulent Criminal Information and police affidavit filed by defendant prosecutor Richard C. Bohling before the Honorable State Judge Robert A. Castor on December 20, 2005. See Plaintiff's Exhibit 1, page 29.

128. Moreover, the alleged illegal arrest warrant obtained from the Honorable Judge Robert A. Castor by defendant Bohling on behalf of himself and divers others gives only the name of the person to be seized as "LYNN ANN HUST". However, the Washington CICS (WACIC) includes a wealth of information about plaintiff including plaintiff's date of birth and social security number in violation of plaintiff's constitutional right to privacy and freedom from governmental identity theft. See Plaintiff's Exhibit 1, page 29 and Document No. 120 pages 226 and 228 at http://www.emccray.com.

129. The telephone number of the person or entity responsible for creating the alleged false and fraudulent extradition warrant on December 21, 2005 in the CICS was traced to defendants Albany County Sheriff and Laramie Police Department.

130. The author is further specifically traceable to an individual or individuals operating in Albany County, Wyoming associated in fact and or employment with government drug enforcement and drug detection dogs. The URL "DARE-LARAMIE.COM" was given as the source of the information appearing in Document No. 120, page 228 at http://www.emccray.com

131. Drug Abuse Resistance Education (D.A.R.E.) is a collaborative effort by certified law enforcement officers, educators, students, parents, and community to offer an educational program in the classroom to prevent or reduce drug abuse and violence among our young people. The emphasis of DARE is to help students recognize and resist the overt pressures that may influence them to experiment with alcohol, tobacco, marijuana, inhalants, and other drugs, as well as with violence.

132. The DARE program also uses K9s—the same dogs used against drug dealers. Defendant Hageman's client for over 10 years, convicted murderer Dale E. Harper, was a Colorado drug dealer that freely roamed the highways and streets of Laramie under the legal protection of attorney-defendant Hageman.

133.   Defendant attorney and City Councilman A. Joe Hageman claimed that during the trial of his client Dale E. Harper, prosecuting attorney al Rerucha unfairly accused him of "being an accessory to murder". "According to the transcript, that accusation ultimately led Hageman to assert the Fifth Amendment, bringing his testimony to an end."

134.   The court, in summing up whether prosecutor Rerucha fairly characterized defendant Hageman's client as having an evil presence, the court stated:

> "Perhaps the argument of the prosecutor about an evil presence was not far from the mark."

135.   The Criminal History Computer of defendant Washington State Patrol is similarly manipulated. The rap sheet for May 1, 2006 listed plaintiff's weight as 100 pounds and listed no warrant as authority for the arrest. The offense committed was "FUGITIVE". The date of arrest given was May 1, 2006.

136.   The rap sheet for June 13, 2008 listed plaintiff's weight as 120 pounds and listed warrant No. CR2005198 as authority for the arrest. Plaintiff was never weighed by any law enforcement defendant. The offense committed was "FUGITIVE". The date of arrest given was changed to June 13, 2008. See Document No. 343 at http://www.emccray.com.

137.   On June 15, 2006, defendant Laramie Police Department's agent-spokesman Commander Dale Stalder, speaking through defendants Casper Star-Tribune, Casper, Wyoming; News Corporation; MediaNews Group; The Associated Press and divers others and their agent Jared Miller, delivered plaintiff a special malicious birthday message via the First Amendment Press:

> *"Former businesswoman faces fraud charges"*, by Jared Miller,[6] Casper Star-Tribune, published June 15, 2006 (Numbered for ease of reference).

> #1. A simple Internet search led authorities to a former Laramie businesswoman wanted on fraud charges related to the collapse last year [2005] of a company called Events WorldWide. (See #4: "After two years without a break in the case".)

---

[6] Reach Jared Miller at (307) 632-1244 or at jared.miller@casperstartribune.net; Publisher: Nathan Bekke, (307) 266-0503; nathan.bekke@casperstartribune.net. A subsidiary of Lee Enterprises Incorporated;
http://www.trib.com/articles/2006/06/15/news/wyoming/e1ac6178187c07b08725718d0082cb7b.txt

**#2.** Lynn Ann Hust was apprehended about two months ago on a warrant in Washington state. She is fighting extradition to Wyoming, said Cmdr. Dale Stalder of the Laramie Police Department.

**#3.** Hust faces three fraud charges stemming from the writing of bad checks worth $6,259, according to court documents used to establish probable cause for the arrest warrant.

**#4.** After two years without a break in the case, police entered Hust's name in the "Google" search engine and found a listing for a woman of the same name running a business similar to Events WorldWide, Stalder said.

**#5.** A detective notified Washington authorities, who made the arrest. Stalder said he did not know the name of the town were (sic) Hust was arrested.

**#6.** Authorities allege that Hust wrote two bad checks totaling more than $1,000 to separate Laramie property rental businesses, and a paycheck worth $609 to one of her former employees, according to the court documents.

**#7.** Hust was the founder of Events WorldWide, which employed about 20 people and marketed health-benefit fairs that linked health companies with potential employees.

**#8.** The company fell apart in May 2005, leaving some employees holding worthless paychecks. Laramie police launched an investigation, but Hust had left town, police said at the time.

**#9.** "In all likelihood she will come back here and face those felony charges," Stalder said. "It's a legal game of when."

**#10.** Albany County Attorney Richard Bohling said he couldn't comment on the extradition proceedings, nor whether Hust might face additional charges if she returns to Wyoming. The original charges were filed in Circuit Court in Albany County in December 2005.

**#11.** Events WoldWide (sic) received support from several Wyoming Workforce Development Training Fund grants.

**#12.** Mark Hawkins, manager of the grant fund, declined to comment other than to say the state actively works to recoup grant money from

businesses that don't fulfill the terms of their contracts.

#13. The Workforce Development Training Fund provides grants to Wyoming businesses for economic development and employee skill training. So far in fiscal year 2006, the fund has written grants to 227 companies totaling more than $1.4 million, Hawkins said.

#14. If convicted, Hust faces 10 years in prison and a $10,000 fine for the first two felony counts. She faces six months in jail and a $1,000 fine for the third count because that check was worth less than $1,000.

137.   It was the fraud of the defendants and not the fraud of plaintiff that was exposed by defendants Casper Star-Tribune, Casper, Wyoming; News Corporation; MediaNews Group; and The Associated Press' alleged fraudulent propaganda machine.

138.   As to statement #1: A simple Internet search was not needed. The CICS contained plaintiff's data and the police visit on May 15, 2005 obtained data for use in locating plaintiff without "Google". This statement was the equivalent of General Tommy Frank's "shock and awe" and was designed to cause the public to say "Wow!" and to lull the public into security that their police was on top of things when in truth and fact the exact opposite was the case. See Document No. 120 at http://www.emccray.com.

140.   As to statement #2, Plaintiff was illegally abducted from her home without the aid of a warrant. The warrant the defendants attempted to use to justify their illegal arrest was obtained via facsimile from defendant Albany County Sheriff after plaintiff's illegal abduction. See plaintiff's Exhibit 1, pages 30-32.

141.   As to statement #3: Because the charges are false and fraudulent, probable cause never existed to arrest plaintiff anywhere in the world.

142.   As to statement #4: A "Google" search and diligent investigation of the information found on Google would have taken police to plaintiff's correct address and not the wrong address.

143.   It was plaintiff who called police and gave them both the time and location where to find plaintiff. Moreover, the information posted on Google was planted there by a computer hacker engaged in extortion; the same having been reported to the Battle Ground Police Department for investigation. Plaintiff was under the impression that police were following up on this report which was also reported to the Federal Government. See Document No. 7 at http://www.emccray.com.

144.   As to statement #5, the defendants incriminate themselves by admitting causing plaintiff to be "arrested and secured" without the permission of defendant Governors Freudenthal and Gregoire in violation of the Clauses of Extradition, Speech, Warrants, Due Process, Equal Protection and Title 18 U.S.C. §§ 2, 3, 4, 241, 242, 371, 1001, 1201, 1341, 1343, 1346, and 1503.

145.   Further as to statement #5: In a document notarized on May 17, 2006, defendant prosecutor Richard C. Bohling told all of the conspirators that:

> "before an arrest could be made, she fled from the State of Wyoming, and is now, as your applicant verily believes, in custody in the Town of Vancouver, County of Clark, State of Washington...."

See Plaintiff's Exhibit 1, at page 5.

146.   As to statement #6: The charges are false and fraudulent. The balance due on each check is zero. The Count One check was disposed of as an overpayment by the Prehoda law firm. The Count Two and Three checks were bounced by defendant Laramie Plains Community Federal Credit Union in an endeavor to create felony check charges. Defendants Hageman, Bohling, Smith and divers other conspirators knew this to be true. Statement #6 is a legal lie. See Plaintiff's Exhibit 1, pages 35-41 and Document Nos. 6, 12, 115, 118, 119 and 120 at http://www.emccray.com. Statement #6 is a truthful paradox in that the defendants are truthfully relying on their legal lies to illegally establish probable cause.

147.   Further as to statement #6: According to the same court documents, plaintiff had retained Laramie attorney Mary Elizabeth Galvan and had paid her $12,000.00 cash for legal defense work. On May 15, 2005, Ms. Galvan filed an "ENTRY OF APPEARANCE OF COUNSEL" in the Circuit Court, Second Judicial District. Ms. Galvan was available to defendants Casper Star-Tribune, Casper, Wyoming; News Corporation; MediaNews Group; The Associated Press and their agent Jared Miller to answer questions and put the defendants in communication with plaintiff. See Plaintiff's Exhibit 1 at page 42.

148.   As to statement #8: The company did not fall apart; rather it was intentionally destroyed by Mr. Mike Martin and other agents representing defendant State of Wyoming and defendant Governor Dave Freudenthal. Statement #8 is a legal lie. Moreover, defendant Hageman told his client Joee Pavlica between May 1 2005 and May 24, 2005 that he and others had been looking for some dirt on plaintiff for some time.

149.   As to statement #9: This statement represents the evil mind of the defendants. All defendants knew the charges were false and fraudulent before the statement was made. Before the statement was made, more than 209 public officials

had received notice of the false prosecution and documents supporting the falsity of the prosecution. See Document Nos. 57 and 89 at http://www.emccray.com.

150.   Further as to statement #9: Stalder made a similar confidence boosting statement during the "Triple Murders?" investigation when he predicted that the GSR tests would corroborate his conclusion as to the real killer, to wit:

> "Stalder said although some forensic tests are still being conducted and the case will not be officially closed until they receive those results, the majority of the investigation into the incident has been completed. He said the forensics information they are waiting on is a gunshot residue (GSR) kit. He said that can take several months to be completed by the Wyoming State Crime Lab.
> ***
> "There is no indication through the investigation or autopsies, that anyone but Justin Geiger used a firearm. The GSR is one more piece of investigating we do when a firearm is involved. We expect it to be corroborating evidence," Stalder said."

*Double homicide timeline*, by Karla Pomeroy, Boomerang Staff Writer; Published On 8/31/2006. See also Document Nos. 80, 109, 110, 111 and 167 at http://www.emccray.com.

151.   As to statements #10 and #12: Defendant prosecutor Bohling and Mike Martin, both of whom spoke freely in the Micah Sturr news article in vilifying EWW and plaintiff, in this news article are now feigning being under a self-imposed legal gag order. These statements represent legal fraud.

152.   As to statement #11: Events WorldWide received financial support from only one grant and partial support from a second grant. The payments of other grants were obstructed by Mike Martin, agent for defendant Governor Dave Freudenthal. Statement #11 is a legal lie.

153.   Defendant Governor Christine O. Gregoire signed the Washington State Governor's Warrant of Arrest and Extradition on June 15, 2006, approximately two weeks after being notified that (1) the papers were not in order and (2) the charges were false and fraudulent.

154.   Plaintiff was again arrested without warrant on June 13, 2008 on top of the May 1, 2006 warrantless arrest that was based on the May 24, 2005 conspiracy agreement between defendants Hageman and Bohling and divers others. Plaintiff spent her birthday and Father's Day in jail. This was again the conspirators' and defendant attorney and City Councilman A. Joe Hageman's way of sending plaintiff a special malicious happy birthday message.

155. No person involved with plaintiff's current arrest seem to know what happened two years ago. They all claimed to be new. Plaintiff was ordered to post bail on top of the bail posted on May 2, 2006 and was given a court date of July 16, 2006; the standard 30-day waiting period for the Demanding Governor to demand and the Asylum Governor to order the fugitive be "arrested and secured"; notwithstanding the fact that the victim: (1) was arrested and secured on May 1, 2006; (2) allowed to post bail on May 2, 2006; (3) was never arrested on the Governor's Warrant issued on June 15, 2006.

156. On June 18, 2008, Deputy Prosecuting Attorney John Peterson, a/k/a Jack Peterson, WSBA Bar #383627, obtained a court order/citation directing Ms. Hust to return to court on June 24, 2008 at 1:00 pm to conduct a "REVIEW OF GOVERNORS' WARRANT"; notwithstanding the court date of July 16, 2008 previously set. This is proof that the Warrants of the Governors of Wyoming and Washington have not been served for more than two years and must be presumed abandoned.

157. On June 24, 2008, at a court hearing presided over by the Honorable Judge Vernon L. Schreiber, the Clark County Prosecuting office was forced to reveal his authority. It was learned for the first time the existence of the two Governors' warrants issued in May and June of 2006, but never served. These warrants were kept secreted away until prosecutor Peterson miraculously found them.

158. Initially, the Honorable District Court Judge Vernon L. Schreiber indicated that he was going to take Ms. Hust in to custody. When the judge learned that the warrants were over two years old and stale, Judge Schreiber released plaintiff to return on July 16, 2008 to the Superior Court. Judge Schreiber stated his reasons for the release was lack of jurisdiction to proceed further."

158. On or about June 27, 2008, an individual associated in fact and employment with the Office of the Clark County Prosecutor executed a document that demonstrated his intent to proceed to effect "SERVICE OF THE GOVERNOR'S WARRANT TO THE STATE OF WYOMING" on "July 16, 2008 at 9:00 a.m." "in the Superior Court of Clark County, State of Washington."

160. Using information obtained from the Washington State Bar and the District Court, it was determined that this individual is:

161. John Peterson, a/k/a Jack Peterson, WSBA Bar #38362; Admitted: 11/17/2006; Clark County Prosecuting Attorney's Office; 1013 Franklin St; Vancouver, WA 98660-3039; (360) 377-2261 (360) 397-2496; jack.peterson@clark.wa.gov.

---

7 Admitted: 11/17/2006; Clark County Prosecuting Attorney's Office; 1013 Franklin St; Vancouver, WA 98660-3039; (360) 377-2261 (360) 397-2496; jack.peterson@clark.wa.gov

162.   The Warrants Mr. Peterson was attempting to execute service on were issued more than two years ago and were never served as directed by the Governors. No Governor has ever sought enforcement of service. Prosecutor Bohling, on whose behalf the Warrants of the Governors were issued, has never sought enforcement between July 31, 2006 and the time of filing this civil rights action.

163.   This factual outcome corroborates plaintiff's legal theory that Prosecutor Bohling never had probable cause and never had a prosecutable case; contrary to his sworn certification before Notary Public Tara Brooke Hickerson subscribed and sworn on May 17, 2006, to wit:

> "I hereby certify that in my opinion the ends of public justice require the arrest and return of the accused to the State of Wyoming for trial at public expense; that I am willing that such public expense shall be a charge on said County of Albany in which the crime was committed; that I have carefully examined into the facts and verily believe that I have sufficient evidence to secure the conviction of said fugitive; that the offense charged and the punishment therefore is defined in section §6-3-702(a)(b)(iii).
> ***
> That this proceeding is not instituted to enforce a private claim or for any other purpose than said prosecution...."

Plaintiff's Exhibit 1 at page 5.

164.   The aforementioned statements represent legal lies in that: (1) defendant Bohling is aware that no crime was committed; and (2) no facts can support his claim that he has truthful evidence to secure the conviction of plaintiff.

X.   Former Deputy County Attorney Defendant Prosecutor Richard C. Bohling's Rise To Power On the Back of Defendant Hageman's "No-Cal-Diet" Murder Trial Retaliation.

165.   On August 11, 2002, Angela Brooks, an agent for defendant Laramie Boomerang further wrote:[8]

> Hageman is quick to say that a personal vendetta is not the driving force behind the campaign, which he has aimed at Rerucha's performance and fiery temperament.

---

[8] *Group campaigns against county attorney*, published on 8/11/2002, by Angela Brooks, Boomerang Staff Writer.

Joe Hageman has a bunch of reasons why Albany County Attorney Cal Rerucha should be booted from office — and he isn't keeping them to himself.

The local attorney has launched a full-assault campaign against the 16-year county attorney who is running for re-election this year. Hageman's truck has become a virtual campaign on wheels. The 1950 Chevrolet is now sporting the "No-Cal-Diet" motto that is the rallying cry behind the grassroots campaign, which has its very own Web site. The 23-person political action committee, Citizens for the Betterment of Albany County (CBAC), is the force behind the anti-Rerucha effort, and Hageman is its chairman.

Hageman said the No-Cal-Diet campaign has earned him notoriety. Total strangers will approach him at the grocery store, or call him at home to cheer him on. He can't keep up with the demand for signs, and the Web site has received over 6,000 hits in little over a month.

166.    On November 6, 2002, Angela Brooks, an agent for defendant Laramie Boomerang wrote:[9]

Richard Bohling defeated incumbent county attorney Cal Rerucha in what some have called the most contentious general election race in Wyoming this year.
***
Bohling, who earned 53 percent of the votes, said his victory was "not that close." Rerucha took 4,982 votes, and Bohling, 5,806, after the final "unofficial" results arrived at about 10 p.m.

The victory means that Bohling will take over as county attorney in January. The former deputy county attorney said he was "elated" about the results.

"I can't begin to describe all that my family has gone through during this campaign," Bohling said.
***
Rerucha had recently fallen in the crosshairs of a political campaign that attempted to oust him from office. He did not say whether the anti-Rerucha campaign hindered his own election efforts.
***
When asked if it he won on his own merit or simply because he was not Rerucha, Bohling said, "I campaigned on my own bearing. I did not campaign as anti-Cal."

[9] *Bohling wins,* by Angela Brooks, Boomerang Staff Writer, published on 11/6/2002.

See Document No. 60 at http://www.emccray.com.

167.   On December 18, 2002, Juliette Rule, an agent for defendant Laramie Boomerang wrote:[10]

> The county's deputy attorneys need to know if they'll have jobs under Albany County Attorney-elect Rich Bohling.
>
> So said Ken Brown, who for 13 years has worked under current county attorney Cal Rerucha.
>
> Brown asked commissioners Tuesday if they could let him and deputy Peggy Trent know next week if they'll have jobs with the county in the new year.
>
> Bohling was present at the meeting, but County Commissioner Chairman Pat Gabriel asked Brown to get in touch with Bohling.
>
> Brown made it clear he feared retribution under the new administration. The new adminsistration could keep him and Trent on staff to buy time to hire replacement deputys, then "find cause" to fire them.
>
> He also said campaign tactics, which were "vindictive" and included displays of "vengenance," were the foundation of his fears. That they haven't yet been told about their employment status indicates a "lack of professionalism." The secretaries in Rerucha's office already have found employment, Brown said, noting that was indicative of their talent and lack of desire to remain on staff under Bohling.
>
> Gabriel noted the issue has come up in private meetings among commissioners. In the meantime, Brown said, his ofice is "working harder than ever" to get case files in order so the new administration can proceed immediately with prosecutions.
>
> "There will be no reason for the future administration that anything will need to be dismissed," he said.
>
> Brown and Trent will be paid by the county through Jan. 5, Gabriel said.

See Document No. 62 at http://www.emccray.com

---

[10] *Deputy attorneys wonder about jobs*, by Juliette Rule, Boomerang Staff Writer, published on 12/18/2002.

168.   On January 8, 2003, Angela Brooks, an agent for defendant Laramie Boomerang further wrote:[11]

> Richard Bohling can officially call himself county attorney.
> ***
> Bohling made one of his first appearances under the new role during a county commissioners meeting Tuesday, where he presented a letter detailing his choices for new staff. Commissioners unanimously approved Bohling's picks.
> ***
> "I felt it was necessary to appoint fresh faces in this office," Bohling said. "I received a very strong message from the voters that they wanted a change in the county attorney's office."
> ***
> Two newcomers — Theodore Racines and James Schermetzler — have taken the deputy attorney spots once held by Peggy Trent and Ken Brown.
> ***
> "I wanted to put together a team of individuals that complimented each other's talents and skills, and that's what I've accomplished," Bohling said. "Every person I've hired brings a unique perspective to their position."
> ***
> Bohling said he had not previously worked with any of the new hires. Each has experience in the field.

See Document No. 64 at http://www.emccray.com.

XI.   The May 24, 2005 Unlawful Agreement Entered Into By and Between Defendant Attorney and City Councilman A. Joe Hageman, Defendant Prosecutor Richard C. Bohling, and Divers Others In Furtherance of the April 2005 Agreement and the WIA Continuing Fraud Conspiracy.

169.   Defendant attorney Hageman's "No Cal-Diet" is directly responsible for defendant Bohling's rise to power. Document No. 59 at http://www.emccray.com. See also Document Nos. 58 and 60-64 at http://www.emccray.com.

170.   Defendant Hageman's "No Cal-Diet" permanently bonded defendants Hageman and Bohling in a professional association and friendship.

171.   When defendant attorney and City Councilman A. Joe Hageman needed to fix a problem with plaintiff's federal whistleblowing activities, he turned to defendant County Prosecuting and Attorney Richard C. Bohling to return the favor given under the "No Cal-Diet" campaign.

---

[11] *County attorney staff named,* by Angela Brooks, Boomerang Staff Writer, published on 1/8/2003.

172.   The prosecutorial fraud; the plan to maliciously prosecute plaintiff and EWW; and the continuing fraud conspiracy that married up with the WIA continuing fraud conspiracy, also deliberately took a sure means to "elude all laws and violate them in fact without appearing to break them in form".

173.   On May 17, 2006, defendant prosecutor Richard C. Bohling executed "Extradition Form No. 1" before Notary Public Tara Brooke Hickerson where he sore the following statements were true:

> "That Lynn Ann Hust stands charged, as appears by the annexed certified copy of the FELONY INFORMATION with the crime of three counts of *fraud by check* in the County of Albany, State of Wyoming, on or between the 10th day of December, A.D. 2004 and the 15th Day of May, A.D. 2005; said crime having been committed as follows:
>
> *"That on or about the 20th day of December, 2004 and the 15th day of May 2005, the defendant, Lynn Ann Hust, did knowingly issue a series of checks which were not paid because the drawer had insufficient funds or credit with the drawee. The foregoing acts all took place within Albany County, Wyoming."*

See Plaintiff's Exhibit 1 at page 5.

174.   In the first statement, defendant prosecutor Richard C. Bohling uses the adverb "between" to describe the period within which the "crime of three counts of *fraud by check*" occurred.

175.   In the second statement, defendant prosecutor Richard C. Bohling uses the conjunction "and" to describe two dates on which a "series of checks" were issued and amounting to the "crime of three counts of *fraud by check*".

176.   According to the original Criminal Information filed by defendant prosecutor Richard C. Bohling, the Count One check was issued "On or about the 10th day of December 2004; the Count Two check was issued "On or about the 1st day of May 2005"; and the Count Three check was issued "On or about the 16th Day of May 2005." See plaintiff's Exhibit 1 at pages 7-8 and 31-32.

177.   Police defendant Gwendolyn K. Smith indicated in her alleged false and fraudulent police affidavit of probable cause that the Count One check was issued on December 10, 2004; the Count Two check was issued on May 1, 2005; and the Count Three check was issued on May 16, 2005.

178.   Defendant Laramie Plains Community Federal Credit Union indicated in two letters dated May 16, 2005 and May 20, 2005 that it closed EWW's business

checking account on "May 16, 2005" without the prior knowledge of any person employed with EWW, including plaintiff.

179.   The demand for extradition issued defendant Governor Dave Freudenthal indicated the crime of "Fraud by Check" was "committed on or between the (sic) December 10, 2004 and May 15, 2005".

180.   Governor Dave's dates would exclude the Count Three check defendants Bohling and Smith claimed was written on May 16, 2005; and would overlook the fact that the credit union bounced the Count Two and Three checks when it abruptly closed EWW's business checking account on May 16, 2005 without notice to EWW.

181.   Plaintiff contends that the fraud lies in the endeavor to exclude the date of May 16, 2005 which would wipe out the claim of a "series of checks" resulting in the commission of a felony.

182.   Defendants Bohling, Hageman and Smith all knew that the date May 16, 2005 rendered fatally flawed their malicious prosecution; particularly after plaintiff had returned to the State of Washington before they could arrest plaintiff and commence their malicious prosecution of plaintiff using fabricated and manipulated evidence and laws.

183.   Defendants Bohling, Hageman and Smith's malicious fraud is further exposed by the operation of the check fraud law itself. According to the face of Wyoming Statutes 6-3-702 and 6-3-703, the crime of "fraud by check" is not committed, and nor does it mature, until after certain events are proven to have taken place in both time and space, to wit:

> Wyo.Stat. 6-3-702. Fraud by check; penalties.

> (a) Any person who knowingly issues a check which is not paid because the drawer has insufficient funds or credit with the drawee has issued a fraudulent check and commits fraud by check.

> Wyo.Stat. 6-3-703. Prima facie evidence of intent that check not to be paid; evidence of knowledge of account balance.

> (a) Any of the following is prima facie evidence that the person at the time he issued the check or other order for the payment of money intended that it should not be paid:

> (i) Proof that at the time of issuance he did not have an account with the drawee;

(ii) Proof that at the time of issuance he did not have sufficient funds with the drawee and that he failed to pay the check or other order within five (5) days after receiving notice of nonpayment or dishonor, personally given or sent to the address shown on the check or other order; or

(iii) Proof that when presentment was made in a reasonable time the issuer did not have sufficient funds with the drawee and he failed to pay the check or other order within five (5) days after receiving notice of nonpayment or dishonor, personally given or sent to the address shown on the check or other order.

Wyo.Stat. 6-3-701. Definitions.

(a) As used in this article:
***
(ii) "Knowingly issues" means issuing a check to obtain property or to pay a debt with intent to defraud or deceive any other person;
***
(v) "Insufficient funds" means when the drawer issues a check from the drawee and has no checking account with the drawee or has funds or credit in a checking account with the drawee in an amount less than the amount of the check plus the amount of all other checks outstanding at the time of issuance. A check dishonored for "no account", "account closed" or "nonsufficient funds" shall also be deemed to be dishonored for "insufficient funds".

184.   In *The State of Wyoming v. Posey*, 314 P.2d 833, 836-837 (1957), the Supreme Court held that:

"The mere utterance of a check is not enough. It must be coupled with scienter."

"It is the *fact* of defendant's *knowledge* which brings the check within the pattern of a fraudulent check...not the bank's refusal of payment."

"Just debts should be paid and the law is adequate to compel their payment where there is an ability to pay, but the criminal law is not a process to be subserved for that purpose. Imprisonment for debt is no longer a part of our law."

185.   As to the Count One check, in a legal opinion dated January 4, 2005, Laurie Edwards Janack, of the Law Offices of Prehoda, Leonard and Janack, LLC, who is

also President of the Albany County Bar Association, resolved the check as an "overpayment" and not due as claimed by defendants Bohling, Hageman and Smith; that defendant attorney Hageman's clients were only entitled to a "partial payment" for December rent; and that should defendant Hageman's client refuse to return the furniture he took from EWW, the law firm "will consider this matter settled." See Plaintiff's Exhibit 1 at pages 35-37.

186.   Defendants Bohling, Hageman and Smith are to be charged with the same knowledge as defendant Hageman's clients and EWW's attorney, Laurie Edwards Janack. Defendants Bohling, Hageman and Smith knew the Count One check was not a crime or a fraud.

187.   As to the Count Two check: By operation of Wyoming check fraud law, sufficient funds were available to pay this check written on May 1, 2005 and was further secured by a security deposit of $2,000.00 in the same amount as the check.

188.   The lease involving the Count Two check was entered into between "Chandler Properties, LLC, LESSOR, and Health Management WorldWide/Events WorldWide LESSEE" on February 21, 2005.

189.   The term of the lease was two years and provided the security deposit of $2,000.00 would be applied as prescribed in the lease, including "expenses due and unpaid". Events WorldWide paid $3285.00 at the commencement of the lease on February 21, 2005. Agents for the contracting parties signed the lease on February 25, 2005. See Document No. 118, pages 195-197 at http://www.emccray.com.

190.   On March 16, 2005, EWW complained through plaintiff in an email to defendant State of Wyoming's agent Mike Martin that the funding for a second contract "has now been approximately over four weeks" delayed. See Document No. 10, page 105 at http://www.emccray.com.

191.   In April 2005, EWW, through plaintiff, presented evidence to defendant Governor Dave Freudenthal's agents, Mr. Sam Western and Mr. Dave Teubner, tending to show that EWW was being intentionally ruined financially by Mr. Mike Martin's unlawful efforts to force the failure of Events WorldWide by withholding and or delaying obligated federal funding in an amount designed to cause the immediate destruction of Events WorldWide.

191.   Defendant Laramie Plains Community Federal Credit Union, who is also an LEDC investor, had custodial access to EWW's daily banking balances and could easily monitor the enormous strain Mr. Martin's illegal manipulation of funding was having on EWW's financial health.

192.   On June 22, 2006, defendant attorney and City Councilman A. Joe Hageman used the mails in interstate commerce to send an electronic mail to plaintiff's electronic mail address while plaintiff was residing in the State of Washington, County of Clark within the federal jurisdiction of this Honorable court.

193.   Defendant attorney and City Councilman A. Joe Hageman's email purported to represent a letter dated May 24, 2005, in which defendant attorney and City Councilman A. Joe Hageman formally asked his friend and professional associate, defendant County Prosecuting and Attorney Richard C. Bohling, to return the favor advanced to him under the "No Cal-Diet" campaign, to wit:

> "FYI concerning the allegations of Ms. Hust that check charges are unfounded. This is the letter I sent to Mr. Bohling concerning a check Ms. Hust had written.
>
> A. JOE HAGEMAN
> ATTORNEY AT LAW
> P.O. Box 850
> 413 E. GARFIELD
> Laramie, WY 82073-0850
> (307) 742-7609
> Admitted in Wyoming and Colorado
> Facsimile
> Number (307) 745-3232
> May 24, 2005
> Mr. Richard Bohling                       VIA FACSIMILE: 721-2554
> Albany County & Prosecuting Attorney      Original follows by mail
> Albany County Courthouse
> 525 Grand Ave.
> Laramie, WY  82070
>
> Dear Richard:
>
> It is my understanding from a newspaper article that there may be some charges being filed against Lynn Hust concerning her operation of Events Worldwide, Inc. My client, Structure Industries, LLC, is her former landlord and they have experienced an unpleasant event. I am transmitting and including herewith Ms. Hust's check no. 5026 in the amount of $3,650.00 which was returned by the bank non-sufficient funds which was issued for payment of the rent. The check was issued and presented in Albany County and my client's would like to receive restitution in the matter.

Please give me a call as I do not wish to infringe upon your authority
but this would appear to me to be a crime and it may assist you in your
investigation and/or prosecution of the overall matter.

Sincerely,
A. Joe Hageman

Encl.
Cc:     Grant Kupko
        Joee Pavlica

194.   Defendant attorney and City Councilman A. Joe Hageman claimed in the
aforementioned email that on May 24, 2005, it was he defendant Hageman, and no
other person, who gave illegal prosecutorial legal advice to defendant County
Prosecutor Richard C. Bohling in the form of a probable cause determination that a
crime had been committed.

195.   A finding of probable cause does not require evidence that is completely
convincing. However, a mere suspicion of criminality, which is what defendant
Hageman gave to defendant Bohling was insufficient to support a finding of
probable cause that would lead a reasonable prosecutor and or a police officer to
conclude that plaintiff had committed or was committing a crime.

196.   In the aforementioned email, defendant attorney Hageman places the issue of
probable cause squarely on his shoulders and not the shoulders of his clients, to wit:

"Please give me a call as I do not wish to infringe upon your authority
but this would appear to me to be a crime and it may assist you in your
investigation and/or prosecution of the overall matter."

197.   In so doing, defendant Hageman illegally substituted himself for his victims-
clients as the complaining witness to the complete truth and full knowledge of all
the circumstances surrounding Count One; an overt act voluntarily done in
furtherance of the April 2005 conspiracy in violation of plaintiff's "clearly
established" civil rights which ultimately resulted in injuries to plaintiff and
plaintiff's family and friends and employment and business relations.

198.   It was a part of the illegal May 24, 2005 conspiracy between defendants
Hageman and Bohling and divers others that defendant prosecutor Bohling would
intentionally not see the untrustworthiness of defendant Hageman and his unsworn
testimony as a complaining witness to Count One.

199.   Defendants Hageman, Bohling and Smiths' version of probable cause ceases
to exist as soon as the evil of the conspiracies and the evil spirit embodied in
defendant Hageman's statement that it "would appear to me to be a crime" is
exorcised.

200.   Moreover, because defendant prosecutor Richard C. Bohling was a member of the May 24, 2005 conspiracy and the April 2005 conspiracy, defendant prosecutor Bohling knew probable cause did not ever exist to support even the slightest decision to prosecute plaintiff.

201.   All lawyers, including prosecutors, are strongly cautioned by the United States Supreme Court, the State Bars and the American Bar Association to avoid being called as a witness or assume a role as a "complaining witness". *Kalina v. Fletcher*, 522 U.S. 118 (1997); *Burns v. Reed*, 500 U.S. 478 (1991); *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

202.   Defendant prosecutor Richard C. Bohling, as part of the May 24, 2005 illegal conspiracy between himself, defendant Hageman and divers others, took this illegal prosecutorial legal advice from defendant Hageman and in turn, gave it to defendant Police Doe One at defendant Laramie Police Department.

203.   Defendant Police Doe One, in turn, gave the illegal prosecutorial legal advice defendant Hageman gave to defendant Bohling to defendant police officer Gwendolyn K. Smith with orders that she prepare a false police affidavit of probable cause that would support the illegal prosecutorial legal advice defendant Hageman gave to defendant Bohling who had converted the illegal prosecutorial legal advice into a Criminal Information as part of defendant prosecutor Bohling's unlawful agreement to support the April 2005 personal vendetta to carry out First Amendment speech retaliation against plaintiff, a federal whistleblower.

204.   At the time she prepared her alleged false police affidavit of probable cause on September 26, 2005, police defendant Gwendolyn K. Smith specifically referred to the existence of an "Information", a document that is normally prepared by one of Defendant Wyoming's County advocates, to wit:

> "Wherefore, affiant believes and therefore alleges that the defendant
> committed the offenses as alleged in the Information and affiant prays
> that an Arrest Warrant be issued for the defendant to appear and
> answer to the charges contained in the Information."

205.   Defendant police officer Gwendolyn K. Smith also struggled to conceal the identity of the person who made the report she personally took regarding Count One, to wit:

> "On July 28, 2005, I took a report of an insufficient funds check that
> had been written by Lynn HUST to Structure Industries on December
> 10, 2004 in the amount of $3,650.00....The initial reporting party was

Joe HAGEMAN, who is the attorney for Grant and Joey KUPKO, the owners of Structure Industries."

206.   In so doing, defendant Smith illegally substituted herself for both the victim and the person making the police report to her; an overt act voluntarily done in furtherance of the April and May 24, 2005 conspiracies to violate plaintiff's "clearly established" civil rights which ultimately resulted in injuries to plaintiff and plaintiff's family and friends and employment and business relations.

207.   In his aforementioned June 22, 2006 email, defendant Hageman stated he made his initial report of the check in Count One to defendant Prosecuting Attorney Richard C. Bohling, and not police.

207.   Defendant Hageman further stated that he gave defendant prosecutor Bohling to understand on May 24, 2005 that he was acting on behalf of clients that included an individual named "Joee Pavlica".

209.   Defendant police officer Gwendolyn K. Smith raised a red flag in paragraph 2 of her alleged perjured police affidavit when she described defendant attorney and City Councilman A. Joe Hageman's client as being "Joey Kupko" and not "Joee Pavlica".

210.   This name discrepancy exposes the fraud in defendant police officer Gwendolyn K. Smith as having never made personal contact of any kind with defendant attorney and City Councilman A. Joe Hageman's clients and check fraud victims. This factual circumstance alone destroys the existence of probable cause for any of the conspirators to believe plaintiff committed a crime or was committing a crime.

211.   The documentary evidence makes clear that it was defendant attorney and City Councilman A. Joe Hageman who instructed defendant Prosecutor Richard C. Bohling to commence a malicious prosecution—a prosecution defendant Prosecutor Richard C. Bohling knew, was illegal on the date and at the time it was suggested to him by defendant attorney and City Councilman A. Joe Hageman. This was an overt act in furtherance of a conspiracy in violation of plaintiff's "clearly established" civil rights that ultimately resulted in injuries to plaintiff and plaintiff's family and friends, and employment and business relations.

212.   The documentary evidence makes clear that it was defendant Prosecutor Richard C. Bohling who instructed defendant Laramie Police Department to aid and abet a malicious prosecution by falsely certifying the existence of probable cause—a prosecution and certification defendant Laramie Police Department knew, were illegal on the date and at the time it was suggested to it by defendant prosecutor Richard C. Bohling; an overt act in furtherance of a conspiracy in violation of

plaintiff's "clearly established" civil rights which ultimately resulted in injuries to plaintiff and plaintiff's family and friends and employment and business relations.

213.   The documentary evidence makes clear that it was defendant Laramie Police Department who instructed defendant police officer Gwendolyn K. Smith to aid and abet a malicious prosecution by falsely certifying the existence of probable cause—a prosecution and certification police officer Gwendolyn K. Smith knew, were illegal on the date and at the time it was suggested to her by her employer, defendant Laramie Police Department. This was an overt act in furtherance of a conspiracy in violation of plaintiff's "clearly established" civil rights which ultimately resulted in injuries to plaintiff and plaintiff's family and friends and employment and business relations.

214.   The documentary evidence makes clear that defendant police officer Gwendolyn K. Smith agreed to become a partner-in-crime with defendants attorney Hageman, prosecutor Bohling and divers others when, on September 26, 2006, defendant police officer Gwendolyn K. Smith made before Notary Public Jennifer Maze, an affidavit of probable cause for use in aiding and abetting a malicious prosecution—a prosecution police officer Gwendolyn K. Smith knew, was illegal on the date and at the time it was suggested to her by her employer, defendant Laramie Police Department. This was an overt act in furtherance of a conspiracy in violation of plaintiff's "clearly established" civil rights which ultimately resulted in injuries to plaintiff and plaintiff's family and friends and employment and business relations.

215.   The aforementioned evidence and allegations make clear that defendant Prosecutor Richard C. Bohling, with the aid of an alleged false and fraudulent Criminal "Information", told, ordered, commanded, charged, enjoined, demanded, required, or otherwise directly instructed defendants Laramie Police Department and police officer Gwendolyn K. Smith to falsely create probable cause and a sworn police affidavit to support his unlawful conspiracy with defendant attorney and City Councilman A. Joe Hageman to maliciously pursue plaintiff across state lines and return plaintiff to Albany County, Wyoming to be maliciously prosecuted; none of which is to be found compatible with the capacity of a public servant of any kind—whether executive, legislative or judicial. This was an overt act in furtherance of a conspiracy in violation of plaintiff's "clearly established" civil rights which ultimately resulted in injuries to plaintiff and plaintiff's family and friends and employment and business relations. *Kalina v. Fletcher*, 522 U.S. 118 (1997); *Burns v. Reed,* 500 U.S. 478 (1991).

216.   On December 20, 2005, defendant County Prosecutor Richard C. Bohling appeared before the Honorable Judge Robert A. Castor in the capacity of a "false traitor" for purposes of obtaining an arrest warrant to support his unlawful conspiracy with defendant attorney and City Councilman A. Joe Hageman to

maliciously pursue plaintiff across state lines and maliciously return plaintiff to Albany County, Wyoming to be maliciously prosecuted; an overt act in furtherance of a conspiracy in violation of plaintiff's "clearly established" civil rights which ultimately resulted in injuries to plaintiff and plaintiff's family and friends and employment and business relations.

217.   The arrest warrant issued by the Honorable Judge Robert A. Castor on December 20, 2005, contained the following statements:

> "WHEREAS Richard C. Bohling, Albany County and Prosecuting Attorney, has this day complained to me, on oath, that LYNN ANN HUST, committed three counts the offense of *fraud by check....*"
> ***
> YOU ARE THEREFORE COMMANDED forthwith to arrest the above individual, LYNN ANN HUST, and bring her before the Court to answer the Information filed herein."

218.   The Honorable Judge Robert A. Castor was negligent in issuing his arrest warrant in that the probable cause referred to by the fourth article of the amendments and which must be supported by oath or affirmation, must be submitted to the committing judge or magistrate himself, and not merely to an official accuser, so that he, the magistrate or judge, may exercise his own judgment on the sufficiency of the ground shown for believing the accused person is guilty; and on this ground must amount to a probable cause belief or suspicion of the party's guilt. "In other words, the magistrate or judge ought to have before him the oath of the real accuser, presented in the form of an affidavit, or taken down by himself by personal examination, exhibiting the facts on which the charge is based and on which the belief or suspicion of guilt is founded.

219.   It was a part of the conspiracy between defendants Hageman, Bohling, Smith and divers others that they would endeavor to cause the Honorable Judge Robert A. Castor to negligently issue his warrant of arrest for plaintiff:

> (1) substitute their combined acts for those of the victims of check fraud; (2) assert the Fourth Amendment claim of a belief as to the existence of probable cause; (3) falsely take an oath or falsely swear before the Honorable Judge Robert A. Castor; and (4) falsely swear out an affidavit under oath for presentment to the Honorable Judge Robert A. Castor that probable cause existed to support the issuance of a warrant of arrest for plaintiff;

220.   This was an over act in furtherance of the conspiracies in violation of plaintiff's "clearly established" civil rights which ultimately resulted in

injuries to plaintiff and plaintiff's family and friends and employment and business relations.

221.   As part of the conspiracy entered into by and between defendants attorney City Councilman Hageman, County Prosecutor Richard C. Bohling, police officer Gwendolyn K. Smith, and divers others to falsely swear, defendant Bohling made the following statement when falsely presenting each count to the Honorable Judge Robert A. Castor in his Criminal Information:

> "Richard C. Bohling...informs the Court and gives the Court to understand that LYNN ANN HUST did commit the following unlawful act...as more particularly set forth in the Affidavit of Officer Gwen Smith filed herein."
> This was an overt act in furtherance of a conspiracy in violation of plaintiff's "clearly established" civil rights which ultimately resulted in injuries to plaintiff and plaintiff's family and friends and employment and business relations.

## XII.   Other Overt Acts Done In Furtherance of the WIA, April 2005 and May 2005 Unlawful Agreements.

### (Phase One. Preparing To Unlawfully Seize Plaintiff.)

222.   One or more principals ordered, directed or otherwise instructed Laramie police to visit plaintiff's Laramie, Wyoming home to collect intelligence; the said was accomplished on May 15, 2005 by two individuals associated in fact and or employment with defendant Laramie Police Department.

223.   One or more principals ordered, directed and or otherwise instructed the Laramie Plains Community Federal Credit Union (LPCFCU) to abruptly close EWW's business checking account in an endeavor bounce checks and to create the appearance of the crime of felony check fraud; the said being accomplished defendant LPCFCU on May 16, 2005 and verified in two letters issued by defendant LPCFCU dated May 16, 2005 and May 20, 2005. See Plaintiff Exhibit 1 at pages 38 and 39.

224.   One or more principals ordered, directed and or otherwise instructed defendant Laramie Police Department to make a telephone call to a telephone in the State of Washington using a telephone number obtained during the police visit on May 15, 2005; said call was completed by defendant Laramie Police Department on May 19, 2005 and recorded on a caller identification device within the town of Battle Ground, Washington in the federal jurisdiction of this Honorable court.

225.   Between April 15, 2005 and May 23, 2005, one or more principals ordered, directed and or otherwise instructed the preparation and release of press and media articles designed to paint the victim grandmother in a false light and defame the character of the victim grandmother as part of a plan to kidnap, murder and dispose of the victim grandmother's body without leaving a trace to any of the conspirators; the commencement of said press and media articles began on, about or between May 20, 2005 and May 23, 2005 using the First amendment assets of defendant Laramie Boomerang; defendant Casper Star-Tribune; KGWN CBS 5 Television; defendant The Associated Press; Cody Café.com; Lee Enterprises; SagamoreHill Broadcasting; defendant MediaNews Group; The McClatchy Company; the Citizen Tribune, Morristown, Tennessee; the Tribune Company, Chicago, Illinois; the Hearst Corporation; the Arkansas Democrat-Gazette; The Journal Gazette, Fort Wayne, Indiana; The New York Times Regional Media Group, Tampa, Florida; The Washington Post; Pioneer Newspapers, Inc., Seattle Washington; E.W. Scripps Company; Gannett, Co. Inc.; the Rutland Herald, Rutland, Vermont; Advance.Net, New York, New York; Schurz Communications Inc., South Bend, Indiana; GateHouse Media, Inc., Fairport, New York; Bonneville International Corp., Salt Lake City, Utah; Southeast Missourian, Cape Girardeau, Missouri; Cox Newspapers, Inc., Atlanta, Georgia; ABC News; and Media General Inc., Richmond, Virginia. See Document No. 6, pages 43-46 at http://www.emccray.com.

226.   Between May 20, 2005 and May 24, 2005, Attorney-coconspirator and Laramie City Council member A. Joe Hageman caused Joee Rain Pavlica to personally bring a check from Colorado to Mr. Hageman in Laramie. This check was previously determined to be an "overpayment" by lawyer Laurie H. Janack representing the Law Firm of Prehoda, Leonard and Janack, LLC, 1273 North 15th Street, Suite 101; P.O. Box 789; Laramie, WY 82073-0789; (307) 742-7896 Fax: (307) 742-9799; said check being subsequently used as Count One, of three counts, in the criminal conspiracy directed at, and inflicted upon, plaintiff.

227.   Between May 2005 and September 26, 2005, one or more principals ordered, directed and or otherwise instructed defendant Prosecutor Richard C. Bohling and the Laramie Police Department to: (1) create false and fictitious victims of check fraud; (2) prepare, based on the false and fictitious victims of check, a false and fraudulent Criminal Information; and (3) provide a copy of the false and fraudulent Criminal Information to the Laramie Police Department; the said was accomplished by defendant Prosecutor Richard C. Bohling on or before September 26, 2005.

228.   Between May 2005 and September 26, 2005, one or more principals ordered, directed and or otherwise instructed police officer Gwendolyn K. Smith to prepare a false and fraudulent police Affidavit to support defendant Prosecutor Richard C. Bohling' false and fraudulent Criminal Information; said Affidavit, citing the Criminal Information, was executed on September 26, 2005 before Laramie, Wyoming Notary Public Jennifer Maze.

229.   Between April 15, 2005 and December 20, 2005, one or more principals
ordered, directed and or otherwise instructed defendant Prosecutor Richard C.
Bohling to commence a false and fraudulent criminal prosecution based on the false
and fictitious victims of check fraud; the bank's abrupt, unannounced closure of the
business checking account; the false and fraudulent Criminal Information; and
Police Officer Gwendolyn K. Smith's September 26, 2005 false and fraudulent police
affidavit. According to court documents, said false and fraudulent criminal
prosecution was commenced on December 20, 2005 under defendant Prosecutor
Richard C. Bohling's oath of office before Albany County, Wyoming Second Judicial
Circuit Court Judge Robert A. Castor and assigned State of Wyoming Criminal
Case No. "CR-2005-198".

230.   Between April 15, 2005 and December 20, 2005, one or more principals
ordered, directed and or otherwise instructed defendant Prosecutor Richard C.
Bohling to obtain a warrant of arrest based on the commencement of the false and
fraudulent criminal prosecution; said warrant was signed and issued by the
Honorable Judge Robert A. Castor on December 20, 2005 under State of Wyoming
Criminal Case No. CR-2005-198.

231.   Between April 15, 2005 and December 20, 2005, one or more principals
ordered, directed and or otherwise instructed that a copy of the warrant be
delivered to the Albany County Sheriff's office to be entered into the Sheriff's
criminal computer to aid the false and fraudulent criminal prosecution; said
warrant being ultimately stamped received by defendant Albany County  Sheriff's
Department on December 20, 2005, at 13:30 p.m.

232.   Between April 15, 2005 and December 21, 2005, one or more principals
ordered, directed and or otherwise instructed defendant Albany County Sheriff to,
among other things: (1) enter the warrant into defendant Sheriff's criminal
computer; and (2) amend the warrant by inserting the following comment: "FULL
EXTRADITION UNLESS OTHERWISE NOTED IN THE MIS FIELD"; entry of
said amended warrant was completed by an agent of defendant Albany County
Sheriff on "December 21, 2005, at 15:38 p.m. See Plaintiff's Exhibit 1 at page 29.

233.   Between April 15, 2005 and May 1, 2006, one or more principals ordered,
directed and or otherwise instructed the continued planning for the illegal
abduction of plaintiff by individuals associated in fact and or employment with
defendant Battle Ground Police Department.

(Phase Two: Execution; Cover; Concealment and Consolidation.)

234.   Between December 20, 2005 and May 1, 2006, one or more principals ordered,
directed and or otherwise instructed defendant Battle Ground Police Department,

Battle Ground, Washington to illegally abduct plaintiff based on the false and
fraudulent warrant of arrest information placed in the national criminal
information computer on December 21, 2005.

235.   In a June 15, 2006 news article, defendant Laramie Police Department
confirmed police in Wyoming were responsible for the overt acts that set into motion
the events that caused the unconstitutional warrantless arrest of plaintiff, to wit:

> #4. After two years without a break in the case, police entered Hust's
> name in the "Google" search engine and found a listing for a woman of
> the same name running a business similar to Events WorldWide,
> Stalder said.

> #5. A detective notified Washington authorities, who made the arrest.
> Stalder said he did not know the name of the town were (sic) Hust was
> arrested.

236.   On May 1, 2006 at approximately 22:30 p.m. PST, individuals associated in
fact and or employment with defendant Battle Ground Police Department, Battle
Ground, Washington, executed a warrantless entry and forcible removal of Lynn
Ann Hust from the safety and security of her home in handcuffs and placed in the
Clark County jail.

237.   Between 22:30 p.m. and 23:00 p.m. on May 1, 2006, after the victim had been
illegally "arrested and secured" on May 1, 2006, one or more principals ordered,
directed and or otherwise instructed individuals associated in fact and or
employment with defendant Battle Ground Police Department and defendant Clark
County Sheriff's Office to access the criminal computer and print the warrant
information on the kidnapped victim grandmother; said access and printing was
accomplished by these defendants on May 1, 2006 at 22:33:20 p.m. PST.

238.   Between 22:30 p.m. and 23:02 p.m. on May 1, 2006, after the victim had been
illegally "arrested and secured" on May 1, 2006, one or more principals ordered,
directed and or otherwise instructed the police kidnappers associated with
defendant Battle Ground Police Department and defendant Clark County Sheriff's
office to use the wires in interstate commerce to forward the printed criminal record
to defendant Albany County, Wyoming Sheriff's office for use in obtaining a copy of
the original warrant; said data being transmitted by these defendants using the
wires in interstate commerce on May 1, 2006 at 23:02 p.m. PST.

239.   Between 23:02 p.m. and 23:15 p.m. on May 1, 2006, after the victim had been
illegally "arrested and secured" on May 1, 2006, one or more principals ordered,
directed and or otherwise instructed one or more individuals associated in fact and
or employment with defendant Albany County, Wyoming Sheriff's Office to respond

to the facsimile sent by defendant Clark County, Washington Sheriff's Office by using the wires in interstate commerce to transmit a copy of the original warrant; said warrant being ultimately transmitted by this defendant using the wires of interstate commerce on May 1, 2006 between 23:14 p.m. and 23:15 p.m. PST.

240.   Between 22:30 p.m. on May 1, 2006 and the early morning hours of May 2, 2006, after the victim had been illegally "arrested and secured" on May 1, 2006, one or more principals ordered, directed and or otherwise instructed one or more individuals associated in fact and or employment with defendant Clark County, Washington Prosecutors' Office to prepare false and fraudulent "extradition" and "fugitive" from justice arraignment papers on the victim using the following "boilerplate" format and provisions of State Law to create the fugitive from justice accusation, to wit:

> "OFFENSE: That she, LYNN ANN HUST, in the County of Clark,
> State of Washington, is on Tuesday, May 2, 2006, a fugitive in Clark
> County, Washington and is charged with the following crimes and is
> subject to arrest and extradition under the following warrants, in
> violation of RCW 10.88.320 and RCW 10.88.330. (Fugitive From
> Justice)."

See Plaintiff Exhibit 1, page 26.

241.   Between 22:30 p.m. on May 1, 2006 and the early morning hours of May 2, 2006, after the victim had been illegally "arrested and secured" on May 1, 2006, one or more principals ordered, directed and or otherwise instructed one or more individuals associated in fact and or employment with the Clark County, Washington Prosecutors' Office to prepare false and fraudulent "extradition" and "fugitive" from justice arraignment papers on the victim using the following "boilerplate" format and Wyoming Judge Robert A. Castor's warrant as the authority, to wit:

| County/State | Warrant | Judge/Clerk of the Court |
|---|---|---|
| ALBANY, WY | CR-2005-198 | ROBERT A CASTOR |
| Crimes: | FRAUD BY CHECK | |

See Plaintiff Exhibit 1, page 26.

242.   Said false and fraudulent "extradition" and "fugitive" from justice papers were filed on May 2, 2006 in the District Court of the State of Washington in and for the County of Clark by defendant Clark County Prosecuting Office.

243.   Between 22:30 p.m. on May 1, 2006 and the early morning hours of May 2, 2006, after plaintiff had been illegally "arrested and secured" on May 1, 2006, one or more principals ordered, directed and or otherwise instructed one or more individuals associated in fact and or employment with defendant Clark County

Court to assign a judge to oversee the false and fraudulent "extradition" arraignment hearing prepared by defendant Clark County Prosecutor's Office; said hearing was conducted during the morning hours of May 2, 2006 and presided over by the Honorable Judge Vernon Lee Schreiber; Bar #3718; admitted 5/3/1972; PO Box 5000; Vancouver, WA. 98666-5000; phone: (360) 694-1672.

244.  Between September 26, 2005 and May 9, 2006, one or more principals ordered, directed and or otherwise instructed defendant Laramie police officer Gwendolyn K. Smith, after plaintiff had been illegally "arrested and secured" on May 1, 2006, to prepare a complaining witness affidavit; said defendant Smith executed before Wyoming Notary Public Tara Brooke Hickerson on May 9, 2006 an "AFFIDAVIT OF COMPLAINING WITNESS" in support of defendant Prosecutor Richard C. Bohling's extradition application to defendant Governor Dave. See plaintiff's Exhibit 1, page 13.

245.  Between September 26, 2005 and May 17, 2006, one or more principals ordered, directed and or otherwise instructed the Honorable Albany County Circuit Court Judge Robert A. Castor, after plaintiff had been illegally "arrested and secured" on May 1, 2006, to sign a "JUSTICE'S CERTIFICATE TO COMPLAINT AND WARRANT" in support of Defendant Prosecutor Richard C. Bohling's extradition application to defendant Governor Dave; said certificate was executed on May 17, 2006. See plaintiff's Exhibit 1, page 14.

246.  Between September 26, 2005 and May 17, 2006, one or more principals ordered, directed and or otherwise instructed defendant County Prosecutor Richard C. Bohling, after plaintiff had been illegally "arrested and secured" on May 1, 2006, to notarize Wyoming Extradition Form No. 1; said Form was notarized on May 17, 2007 before Wyoming Notary Public Tara Brooke Hickerson. See Plaintiff's Exhibit 1, pages 5 and 6.

247.  Between September 26, 2005 and May 29, 2006, one or more principals ordered, directed and or otherwise instructed the Honorable Albany County Clerk Jackie Gonzales execute, after plaintiff had been illegally "arrested and secured" on May 1, 2006, a "COUNTY CLERK'S CERTIFICATES TO OFFICIAL CAPACITY OF COUNTY ATTORNEY, JUSTICE OF THE PEACE AND CLERK OF COURT" extradition form in support of defendant Prosecutor Richard C. Bohling's extradition application to defendant Governor Dave; said form was executed On May (illegible), 2006. See Plaintiff's Exhibit 1, page 15.

248.  Between September 26, 2005 and May 29, 2006, one or more principals ordered, directed and or otherwise instructed defendant Governor David Freudenthal to make a demand on defendant Washington Governor Christine O. Gregoire for the return of plaintiff to stand trial on false charges, after plaintiff had been illegally "arrested and secured" on May 1, 2006; said demand was signed and

issued by defendant Governor Dave Freudenthal of May 29, 2006. See Plaintiff's Exhibit 1, page 4.

249.    Between September 26, 2005 and May 29, 2006, one or more principals ordered, directed and or otherwise instructed the Honorable Wyoming Secretary of State Joseph B. Meyer to certify the official capacities and signatures of "the Honorable Dave Freudenthal"; "the Honorable Robert A. Castor"; and "Jackie Gonzales" in support of defendant Prosecutor Richard C. Bohling's extradition application to defendant Governor Dave Freudenthal and seal defendant Governor Dave Freudenthal extradition demand to be made on the Honorable Washington Democratic Governor Christine Gregoire; said tasks were accomplished on May 29, 2005. See Plaintiff's Exhibit 1, pages 4 and 16.

250.    Between May 2, 2006 and June 2, 2006, after plaintiff had been illegally "arrested and secured" on May 1, 2006, one or more principals ordered, directed and or otherwise instructed one or more individuals associated with defendant Clark County Prosecutor's Office to prepare a false and fraudulent "extradition" and "fugitive" from justice "warrant and 60 day commitment" warrant; said warrant, dated June 1, 2006, was signed and presented on or about June 2, 2006 by Grant Eugene Hansen, Deputy Prosecuting Attorney, Clark County Prosecutor's Office, Bar #5167; admitted 10/18/1973; 1200 Franklin St, Vancouver, Washington 98660; phone: (360) 397-2261; fax: (360) 397-2230. See Plaintiff Exhibit 1, pages 27-28.

251.    Between May 2, 2006 and June 2, 2006, after plaintiff had been illegally "arrested and secured" on May 1, 2006, one or more principals ordered, directed and or otherwise instructed one or more individuals associated with defendant Clark County Court system to appoint a judge to preside over a hearing scheduled for June 2, 2006 regarding the false and fraudulent "extradition" and "fugitive" from justice "warrant and 60 day commitment" paper signed by Grant Eugene Hansen; said hearing was held on June 2, 2006 and presided over by Judge Vernon Lee Schreiber; Bar #3718; admitted 5/3/1972; PO Box 5000; Vancouver, WA. 98666-5000; phone: (360) 694-1672.

252.    Between May 2, 2006 and June 9, 2006, after plaintiff had been illegally "arrested and secured" on May 1, 2006, one or more principals ordered, directed and or otherwise instructed State of Washington Assistant Attorney General Paul Douglas Weisser[12] to review the demand made on defendant Governor Christie O. Gregoire; said demand was "APPROVED AS TO FORM" on June 9, 2006 by attorney Weisser. See Plaintiff's Exhibit 1, pages 6 and 17.

---

[12] Paul Douglas Weisser; WSBA Bar #17918; Admitted: 08/17/1988; Office of the Attorney General; Criminal Justice Division; State of Washington; PO Box 40116; Olympia, WA  98504-0116; (360) 586-1445; fax: (360) 586-1319.

253.   Between May 2, 2006 and June 15, 2006, after plaintiff had been illegally "arrested and secured" on May 1, 2006, one or more principals ordered, directed and or otherwise instructed  defendant Governor Christine O. Gregoire to sign and issue the "GOVERNOR'S WARRANT OF ARREST AND EXTRADITION in an endeavor to extend plaintiff's illegal captivity and support plaintiff's unconstitutional removal from the State of Washington; said Warrant was signed and issued on June 15, 2006. See Plaintiff's Exhibit 1, page 3.

254.   Between May 15, 2006 and June 13, 2006, after the victim had been illegally "arrested and secured" on May 1, 2006, one or more principals ordered, directed and or otherwise instructed Judge Robert Castor to prepare and preside over a welcome back hearing for the victim grandmother scheduled for June 13, 2006; said hearing was prepared and presided over by Judge Castor on June 13, 2006 twice—once in the morning at 09:00 a.m. and again at 13:00 p.m., because the victim grandmother failed to voluntarily return to Wyoming.

255.   Between July 31, 2006 and June 5, 2008, after the victim had been illegally "arrested and secured" on May 1, 2006, one or more principals ordered, directed and or otherwise instructed defendant Battle Ground Police Department to arrest plaintiff without a warrant; an attempt to arrest was made on or about June 5, 2008 by individuals associated in fact and or employment with defendant Battle Ground Police Department who left a police business card.

256.   Printed on the front of defendant Battle Ground Police business card left in a neighborhood where the Battle Ground police made their first attempt to arrest plaintiff without a warrant was the following information:

     The City of Battle Ground logo
     507 SW 1st St
     Battle Ground, WA 98604
     www.cityofbg.org

     Police Department (360) 342-5200
     Fax: (360) 342-5202
     kimberly.armstrong@ci.battle-ground.wa.us

     Kimberly Armstrong - detective

257.   Hand written is: 342-5242 desk and 980-1512 cell.

258.   The note on the back of a business card states:

"Lynn Hust- Please call me at either #. I have been notified about suspicious activity using your identification. Thank you, Detective Armstrong."

259.   Between July 31, 2006 and June 13, 2008, after the victim had been illegally "arrested and secured" on May 1, 2006, one or more principals ordered, directed and or otherwise instructed defendant Battle Ground Police Department to arrest plaintiff without a warrant; said warrantless was finally accomplished on June 13, 2008 by individuals associated in fact and or employment with defendant Battle Ground Police Department based on the same facts and the out-of-state warrant of Wyoming Judge Robert A. Castor as the May 1, 2006 illegal arrest.

260.   Between June 13, 2008 and June 18, 2008, after the victim had been illegally "arrested and secured" on June 13, 2008, one or more principals ordered, directed and or otherwise instructed defendant Clark County Prosecuting Office to obtain a hearing on the stale and secreted Governor's Warrant; said hearing was secured on June 18, 2008 by Deputy Prosecuting Attorney John Peterson, a/k/a Jack Peterson, WSBA Bar #38362[13], with a court order/citation directing plaintiff to return to court on June 24, 2008 at 1:00 pm to conduct a "REVIEW OF GOVERNORS' WARRANT"; notwithstanding the court date of July 16, 2008 previously set. This is proof that the Warrants of the Governors of Wyoming and Washington have not been served for more than two years and must be presumed abandoned. See Plaintiff's Exhibit 1, page 19.

261.   Between June 24, 2008 and June 27, 2008, after the victim had been illegally "arrested and secured" on June 13, 2008, one or more principals ordered, directed and or otherwise instructed defendant Clark County Prosecuting Office to obtain a hearing to perform "service" on the stale and secreted Governor's Warrant; said hearing was secured for July 16, 2008 on June 27, 2008 by Deputy Prosecuting Attorney John Peterson, a/k/a Jack Peterson, WSBA Bar #38362.[14]

262.   On or about July 15, 2008, one or more principals ordered, directed and or otherwise instructed defendants Clark County Prosecuting Office, Battle Ground Police Department and Clark County Sheriff's Department to continue to pursue and harass plaintiff in flagrant disrespect to this court's jurisdiction of the federal question presented in plaintiff's habeas corpus petition filed on July 10, 2008.

---

[13] Admitted: 11/17/2006; Clark County Prosecuting Attorney's Office; 1013 Franklin St; Vancouver, WA 98660-3039; (360) 377-2261 (360) 397-2496; jack.peterson@clark.wa.gov

[14] On July 10, 2008, plaintiff filed a petition for writ of habeas corpus in this court. On July 15, 2008, plaintiff filed motions in the Federal District Court and defendant Clark County Superior Court to stay all State court proceedings relevant to the federal question.

263.   On July 16, 2008, pursuant to the aforementioned order or direction, at approximately 2:15p.m., Clark County, Washington Prosecutor Mark Ellis Beam[15] contacted plaintiff via telephone to inquire why she was not in court for the July 16, 2008 hearing in Defendant Superior Court on Service of the Governor's Warrants.

264.   Prosecutor Beam personally told plaintiff that plaintiff's federal habeas corpus case was irrelevant as far as he was concerned due to the fact that he has a valid Wyoming Governor's warrant; and that unless he personally gets a court order from a judge he does not have to Stay State Proceedings and he can have police enforce them at anytime.

265.   Prosecutor Beam is clearly misguided in his assertions. First, because the affidavit was made before a Notary Public and not a "magistrate" as mandated by Title 18 U.S.C.A. § 3182, both Governor's warrants violated the Constitution and Laws of the United States and were *void ab initio*. Second, the Wyoming prosecution is malicious and was commenced for purely private purposes to silence a federal whistleblower. Third, the Wyoming statute cited does not exist. Fourth, all three counts of check fraud are false and were fabricated.

266.   Prosecutor Beam and the Office of the Clark County Prosecuting Attorney have no legal authority to exercise dominion over the void Extradition Warrants issued by defendant Governors Freudenthal and Gregoire.

267.   Defendant Governor Freudenthal's Demand was made on defendant Governor Gregoire and the warrant was directed to "**SHERIFF JIM POND AND/OR HIS DULY AUTHORIZED DESIGNEE**, as Agent on the part of this State...."

268.   Prosecutor Beam and the Office of the Clark County Prosecuting Attorney are not agents of the State of Wyoming. This is fraud on the federal interstate extradition laws and an overt act done to further the Wyoming conspiracies.

269.   Defendant Governor Gregoire's Warrant was directed "To Any Sheriff or Other Peace Officer of the State of Washington...." Governor Gregoire further indicated that:

> "The Governor of the demanding state has, pursuant to the Constitution and Laws of the United States, demanded of me that I cause the fugitive to be arrested and delivered to "**Sheriff Jim Pond or Designee**, agent authorized to receive her into custody and return her to the demanding state."

---

[15] WSBA Bar # 5957, admitted 05/08/1975, Clark County Prosecutors Office; 1013 Franklin St, PO Box 5000; Vancouver, WA 98666-5000; (360) 397-2261; fax: (360) 397-2230; mark.beam@clark.wa.gov

270.   Clearly, there is no role to be played by Prosecutor Beam and the Office of the Clark County Prosecuting Attorney under the Federal Extradition Clause and Extradition Act and the Warrants of the two defendant Governors. Prosecutor Beam and his office illegally ingratiated themselves in the extradition proceedings in an endeavor to cover and conceal the unconstitutional warrantless arrests and false and fraudulent fugitive from justice documents and warrants at issue in this petition. This is fraud on the federal interstate extradition laws and an overt act done to further the Wyoming conspiracies.

271.   On July 28, 2008, two individuals wearing the uniforms and driving the police car associated with Defendant Battle Ground Police Department visited an address associated with plaintiff to arrest plaintiff on what the individuals claimed to be a new warrant issued that morning. This is fraud on the federal interstate extradition laws and an overt act done to further the Wyoming conspiracies.

XIII.  Laramie Triple Murders?

272.   On July 17, 2006, the Associated Press reported:

> "Laramie police Commander Dale Stalder said investigators were treating the case as a *triple murder*, but that police didn't think there was any danger to the community. Stalder said all of the people involved were accounted for and that police were considering the possibility it might be a murder-suicide.

> "We just don't have all the facts yet," Stalder said Sunday night.

> Found dead in the house were UW students Justin R. Geiger, 20, of South Beloit, Ill., and Amber N. Carlson, 19, of Denver, and Laramie resident Adam Towler, 20.

> Geiger lived in the house. Another resident, Anthony N. Klochak, 19, of Chardon, Ohio -- also a UW student -- was treated for what Stalder called "superficial wounds" and released from an area hospital.

> Stalder wouldn't say how the three died or how Klochak was injured, other than to say that their deaths were "violent."

> Stalder wouldn't say how the three died or how Klochak was injured, other than to say that their deaths were "violent."

> "I don't have any other information now except to say it is definitely criminal in nature," he said.

Neighbors reported at about 2 a.m. that Klochak was yelling for
someone to call police to the home a couple of blocks south of the UW
campus."

(Emphasis added.) For additional details and a timeline on the "triple murder?" see
Document Nos. 80, 109, 110, 111, and 167 at http://www.emccray.com.

273.   The case was given its moniker with a question mark after police initially
told the public the **three deaths were "homicides" or a "triple murder", with one
survivor**, Anthony N. Klochak, who police immediately ruled out as a suspect. After
the public questioned the details of the initial report, the case was changed to a
murder-suicide and one survivor, Anthony N. Klochak, who, according to police,
somehow managed to escape before the murder-suicide took place.

274.   There is an acute regularity or irregularity in the Laramie Police
Department's accuracy or inaccuracy in the 2006 "triple murder?" investigation and
the 2005 perjured police affidavit of Gwendolyn K. Smith used to frame plaintiff for
the crimes of check fraud in the case now before this Honorable court.

## XIV.   Plaintiff Is In Imminent Danger of Serious Physical Injury.

275.   The threat to act with evil or malice and inflict great bodily harm had been
crystallized by the numerous overt acts of the individuals partnered in crime with
defendant Attorney A. Joe Hageman.

276.   After briefly speaking to defendant Governor Dave Freudenthal in April 2005
about EWW's business plan, phase 2 after a community forum at a local Laramie
restaurant; plaintiff was followed by Tim Stamp, President of LEDC, to the parking
lot. There Mr. Stamp threatened plaintiff's life and told plaintiff that plaintiff had
made a big mistake going to the Governor and Senator Enzi's office; and that he and
his boys would make plaintiff pay dearly and make plaintiff regret coming to
Wyoming.

277.   Agents for defendant Clark County Prosecuting Office, defendant Battle
Ground Police Department and defendant Clark County Sheriff's Department have
continued to seek hit and miss custody of plaintiff's body for the sole purpose of
illegally returning plaintiff to defendant State of Wyoming, notwithstanding this
Honorable court jurisdiction of plaintiff's habeas corpus petition filed on July 10,
2008.

278.   Defendant Governors Gregoire and Freudenthal have steadfast refused to
recall their warrants, notwithstanding the evidence that they have been betrayed
by defendants Hageman, Bohling, Smith and divers others.

279.   Defendant Attorney A. Joe Hageman took the Fifth in the murder trial of one of his clients, Dale E. Harper, reported at *Dale E. Harper v. The State of Wyoming*, 970 P.2d 400; 1998 Wyo. LEXIS 180 (1998).

280.   John Ahrenholtz, who suffered a tort and business interference by defendant Laramie City Council and the LEDC, personally told plaintiff in July 2006 that he was offered $1million to keep silent about the community block grants conspiracy or some "cowboys" would be sent to talk to him. Mr. Ahrenholtz took this to mean a threat to his life. See Document No. 2, paragraph 79 and Document No. 51, pages 70-71, http://www.emccray.com. See also: *Ahrenholtz v. Laramie Economic Development Corporation*, 2003 WY 149; 79 P.3d 511; 2003 Wyo. LEXIS 176.

281.   During July 2006, Laramie police were asked to investigate the deaths of three young adults. The police, in the early stages of the investigation, confused the public with the facts; causing the public to question the police and label the event "Triple Murders?" (with a question mark)

282.   On December 13, 2007, an individual that uses the screen name "Mr. Fuzz" demonstrated his defense for defendant Albany County Prosecutor Richard C. Bohling in a rant posted on the Laramie Message Board, to wit:

> Emanuel McCray...is a spammer, Period. Ms. Hust is a scammer, Period. She passed hot checks and ran out of town.
>
> Judge Gonzalez does not support his case, but in fact did dismiss his appeal with PREJUDICE. Despite his claim that the Judge found someone violated the Constitution...which is not in evidence other than his (McCray's) assertions/allegations.
> ***McCray's life is a bleak one...."

See Document Nos. 37 and 38 at http://www.emccray.com.

283.   Mr. Fuzz's steadfast defense of Republican Prosecutor Richard C. Bohling and Attorney & Laramie City Council Member A. Joe Hageman came on the heels of reading many of the documents posted on the website http://www.emccray.com that clearly show the case was fabricated to carry out a purely private attempt to cause serious bodily injury using the power and tools of State Government available to prosecution and corrections officials in the States of Washington and Wyoming.

284.   Should the false and fraudulent prosecution go to trial, Mr. Fuzz would be a member of a jury pool favorable to and selected by defendant Prosecutor Richard C. Bohling in conspiracy with divers other persons, including attorneys.

285.   Another Laramie Message Board member named "Dano", likewise attempted to debase the plaintiff and the San Diego trial court's Judgment and even went as

far as to claim that a Google search on Emanuel McCray's name took him to a porn website. No such "porn website" could be found. "Dano" was asked to provide his source of the information and to this date has refused to apologize to Emanuel McCray or the Honorable San Diego Federal Chief Judge Irma Elsa Gonzalez.

286.   Dano would also be a member of a jury pool favorable to and selected by defendant Prosecutor Richard C. Bohling in conspiracy with divers other persons, including attorneys.

287.   Another individual who posts under the name of "Hetzer", appeared to also adopt Mr. Fuzz's debasing attempts with the following post:

> "I believe Fuzz. For a minute I thought I had been kidnapped and dragged into the filthy White House."

See Document Nos. 37 and 38 at http://www.emccray.com.

288.   Hetzer would also be a member of a jury pool favorable to and selected by Republican Prosecutor Richard C. Bohling in conspiracy with divers other persons, including attorneys.

289.   Mr. Fuzz was also able to cause an individual going by the name of "Integrity", who had a genuine fear that certain individuals in the City of Laramie possessed the capability to murder whistleblowers, to change his position and adopt Mr. Fuzz's legal theories. Laramie Message Board Gold Member "integrity" wrote in post #7610 - 05/28/07 03:06 AM Re: Welldog:

> Sid -- Not sure who you are replying to; me or T. Advo. I have been referencing my sources -- the websites of BSG and Enzi (Thomas and Cubin have the same). I'll take an honest skeptic any day. But skeptics have to have sources also: Find me the location of NDC and its 50 high tech workers and I'll shut up. My web search found me MORE than enough to scare me. For EXAMPLE:
>
> http://www.emanuelmccray.com/uploads/DOCUMENT_7_-_UNITED_STATES_PETITION_TO_1_...doc
>
> This whistleblower is DEAD for exposing activity here in quiet little Laramie. Activity that involved Welldog, LEDC, and much more of the in-appropriations committee. It names some very living people: Councilor Joe: is this real? What is it all about?
>
> *** I hope the whistleblower site referenced above is what? A hoax? Sure, a hoax -- probably is. But even then you have to ask: WHY did someone take the time to do it? Then to the WHY add the websites of

Enzi and BSG and it takes on some credibility. Read the LEDC praise
of Welldog and compare it to the LEADS praise of NDC. The scandal of
Welldog and NDC is not a hoax. They have ominous parallels.
http://www.laramiemessageboard.com/forum/ubbthreads.php?ubb=showflat&Numb
er=9153&page=0&fpart=3

290.   On or about July 24, 2006, plaintiff began making posts on the Laramie
Message Board in an endeavor to get her case heard before the public because
defendant Laramie Boomerang and defendant Casper Star-Tribune refused to tell
plaintiff's side while at the same time these defendants and their affiliates told the
defendants' side.

291.   As soon as plaintiff began providing information on her case to Laramie
Message Board Members Louella Parsons (Member # 197) and "bill Clinton"
(Member # 416), plaintiff's posting rights were revoked and all of the information
deleted from the posts on or about July 26, 2006.

292.   The following reason was given by Creepy Eddie Haskell (Member # 17) on
07-26-2006 08:00 PM:

Thank you for your post laramiehelper, but I agree with everyone who
attempted to read it.
Short and to the point is better.
Since I don't like to read sideways I'm closing this topic.

Thanks,
Eddie

## FIRST CAUSE OF ACTION
### (Civil Conspiracy)

293.   Plaintiff repeats and realleges each and every allegation contained in
paragraphs 1-292 inclusive, with the same force and effect as if fully set forth
herein.

294.   From, on or about July 2004 and continuing at present, Governor Dave
Freudenthal; Governor Christine O. Gregoire; Attorney Richard C. Bohling;
Gwendolyn K. Smith; A. Joe Hageman; Arthur David Curtis; Doe One Battle
Ground Police Arresting Officer, May 1, 2006; Doe Two Battle Ground Police
Arresting Officer, May 1, 2006; Doe Three Battle Ground Police Arresting Officer,
June 13, 2006; and Doe Four Battle Ground Police Arresting Officer, June 13, 2006,
together with one or more agents of the following defendants:
(1) The State of Wyoming; (2) The State of Washington; (3) City Council, The City of
Laramie; (4) County Board of Commissioners, The County of Albany; (5) Second

Judicial Circuit Court, County of Albany; (6) Laramie Police Department; (7) Albany County Sheriff's Department; (8) Battle Ground Police Department; (9) Clark County Sheriff's Department; (10) Office of the Clark County Prosecuting Attorney; (11) District Court, County of Clark; (12) Superior Court, County of Clark; (13) County Board of Commissioners, County of Clark; (14) City Council, The City of Battle Ground; (15) Washington State Patrol; (16) Laramie Plains Community Federal Credit Union; (17) Laramie Boomerang; (18); Casper Star-Tribune; (19) News Corporation; (20) MediaNews Group; (21) The Associated Press, possessed knowledge of and agreed to both the objective and the course of action that would result the injury to Events WorldWide and plaintiff; one or more of them did commit one or more of the following overt acts pursuant to that agreement:
(a) withheld federal funds; (b) resurrected stale check to support false prosecution; (c) closed EWW's business checking account without notice; (d) bounced two checks to create appearance of crime of felony check fraud; (e) issued two or more false light publications; (f) committed two invasions of residential privacy; (g) commenced and maintained a false prosecution; (h) created three false accusations of check fraud; (i) prepared a false police affidavit; (j) created a false criminal information; (k) procured an arrest warrant from the Honorable Judge Robert A. Castor; (l) executed an application for requisition for extradition; (m) issued a Governor's Demand Warrant; (n) issued a Governor's Warrant of Arrest and Extradition; (o) procured an unconstitutional provisional arrest of plaintiff; (p) executed an unconstitutional warrantless arrest of plaintiff; (q) falsified information in Wyoming Crime Information Computer; (r) falsified information in Washington Crime Information Computer; and (s) false imprisonments;
which resulted in Events WorldWide and its employees, which include plaintiff, being damaged in their (a) business and contractual relations; (b) privacy; (c) personal and or business character; and (d) bodily integrity, which all the defendants are jointly and severally liable.

## SECOND CAUSE OF ACTION
(Fraud—WIA of 1998)

295.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-294 inclusive, with the same force and effect as if fully set forth herein.

296.   During July 2004, Events WorldWide and plaintiff were lawfully lured into the State of Wyoming under the WIA of 1998. Tim Stamp, agent for defendant Governor Dave Freudenthal promised plaintiff, EWW's agent, that he and others would assist with the grant application process and that all EWW needed to do was to open an office, start interviewing, hire its first round of employees, and Tim Stamp and others would do the rest. Plaintiff trusted their assertions and claims of business prosperity for EWW.

297.   Defendant Governor Dave and his agents, defendant attorney and City
Councilman A. Joe Hageman, Gary Negich, Mike Martin, Tim Stamp, Dave
Teubner and defendant prosecutor Richard C. Bohling knew of the existence of an
illegal "bait and switch" conspiracy.

298.   Defendant Governor Dave Freudenthal never told plaintiff that his agents,
defendant attorney and City Councilman A. Joe Hageman, Mike Martin, Tim
Stamp, Dave Teubner and defendant prosecutor Richard C. Bohling were operating
a "bait and switch" conspiracy that was riding piggyback illegally on the WIA of
1998.

299.   Plaintiff and EWW were induced into reliance by (1) the promises of
prosperity; (2) being paraded around town and courted primarily by defendant
Governor Dave Freudenthal's agent, Mr. Gary Negich, similar to how Mr. Drysdale
paraded the Clampetts; and (3) being properly paid for the first contract.

300.   After inducing reliance, agent Mike Martin set into motion the plan to seize
control of EWW's decision-making by delaying payment on the second contract and
or funding it below the maximum required by law. Agent Mike Martin had no legal
authority to delay or withhold funding.

301.   This delay caused EWW to experience financial difficulty and "front" the
wages the WIA of 1998 was designed to pay. Defendant Laramie Plains Community
Federal Credit Union exacerbated EWW's financial health when it abruptly closed
EWW's business checking account.

302.   EWW suffered a breach in its federal contracts with defendant Dave
Freudenthal and a breach in defendant LPCFCU's fiduciary duties owed to EWW.
As a result of the aforementioned breaches, all employees, including plaintiff,
suffered lost of employment, injuries and damages which all the defendants are
jointly and severally liable.

## THIRD CAUSE OF ACTION
(Fraud—Federal Interstate Extradition)

303.   During March 2005 plaintiff had conversations where she complained to
Mike Martin on behalf of EWW, that the funding delay was causing EWW to suffer
financial harm the WIA of 1998 was designed to lessen. Pursuant to the WIA of
1998, Mike Martin was an agent of defendant Governor Dave Freudenthal.

304.   During April 2005, plaintiff, on behalf of EWW, held a meeting with Sam
Western and Dave Teubner regarding Mr. Mike Martin's unlawful efforts to force
the failure of Events WorldWide by withholding or delaying obligated federal
funding in an amount designed to cause the immediate destruction of Events

WorldWide. Pursuant to the WIA of 1998, Sam Western and Dave Teubner were agents of defendant Governor Dave Freudenthal.

305.   Approximately one week after plaintiff had exposed the unlawful withholding of federal funds by Mr. Mike Martin to Sam Western and Dave Teubner, plaintiff was threatened in a parking lot in the City of Laramie by Tim Stamp that the unlawful WIA cabal would get even for reporting the matter to Sam Western and Dave Teubner. At the time of the threat, Tim Stamp was serving as the President of the LEDC; situated as such, Tim Stamp was an agent of defendant Governor Dave Freudenthal pursuant to the WIA of 1998.

306.   On May 15, 2005, members of defendant Laramie Police Department visited plaintiff's Laramie City home to gather intelligence regarding the success of the conspirators in causing the failure of Events WorldWide and to discover Plaintiff's plans after the failure of Events WorldWide.

307.   On May 16, 2005, defendant Laramie Plains Community Federal Credit Union exacerbated EWW's financial health when it abruptly closed EWW's business checking account and crystallized the threat to plaintiff's body when two of its agents refused to allow plaintiff to make deposits on behalf of EWW.

308.   On or about May 18, 2008, plaintiff left the City of Laramie out of fear for her life. Nevertheless, plaintiff harbored no belief that anyone in the State of Wyoming would pursue plaintiff across state lines.

309.   Plaintiff loved her Government like a good Christian loves God. Plaintiff placed complete trust in Government and was never under the belief that her Government would ever use its powers to illegally harm plaintiff.

310.   As time passed, plaintiff relied more and more on the belief that Government would not illegally harm plaintiff.

311.   Unbeknownst to plaintiff, defendants Tim Stamp, A. Joe Hageman, Gwendolyn K. Smith, Richard C. Bohling and divers others had conspired to retaliate against plaintiff across state lines by violating the Constitution and Laws of the United States and the federal and state interstate extradition laws.

312.   The Extradition Clause, as implemented by the Extradition Act, is set forth as follows:

U.S. Constitution Article 4, Section 2, Clause 2:
A Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be

delivered up, to be removed to the State having Jurisdiction of the Crime.

Title 18 U.S.C.A. § 3182:
Whenever the executive authority of any State or Territory demands any person as a fugitive from justice, of the executive authority of any State, District, or Territory to which such person has fled, and produces a copy of an indictment found or an affidavit made before a magistrate of any State or Territory, charging the person demanded with having committed treason, felony, or other crime, certified as authentic by the governor or chief magistrate of the State or Territory from whence the person so charged has fled, the executive authority of the State, District, or Territory to which such person has fled shall cause him to be arrested and secured, and notify the executive authority making such demand, or the agent of such authority appointed to receive the fugitive, and shall cause the fugitive to be delivered to such agent when he shall appear. If no such agent appears within thirty days from the time of the arrest, the prisoner may be discharged.

313. Pursuant to U.S. Constitution Article 4, Section 2, Clause 2 (Extradition Clause), as implemented by Title 18 U.S.C.A. § 3182 (Extradition Act), defendant Governor Dave Freudenthal is the "Executive Authority" the People of the United States vested the discretionary federal constitutional Power to demand another Executive Authority to cause a fugitive found in that State be "arrested and secured" to be returned to the jurisdiction wherein the crime is alleged to have occurred.

314. Pursuant to the Extradition Clause, as implemented by the Extradition Act, defendant Governor Christine O. Gregoire is the "Executive Authority" the People of the United States vested the ministerial federal constitutional duty to cause a fugitive found in her State be "arrested and secured" to be returned to the jurisdiction wherein the crime is alleged to have occurred pursuant to a duly certified and authenticated demand having been made on her by the Executive Authority of the demanding State.

315. Wyoming Statute § 7-3-223 mandates that when the return to the State of a person charged with crime is required, the district attorney for the county in which the offense is committed shall present to the governor a written application for a requisition for the return of the person charged.

316. Defendant County and Prosecuting Attorney Richard C. Bohling is the person to whom the statute is directed, and as such, became an agent to defendant Governor Dave Freudenthal for purposes of federal interstate extradition laws.

317.   On May 1, 2006, plaintiff was "arrested and secured" without the Warrants of Governors Dave Freudenthal and Christine O. Gregoire.

318.   After an individual is illegally "arrested and secured", the individual is vilified by the culprits in the press, media and on the Internet and made to look like the definition of the words: morally base; despicable; loathsome; shamefully wicked; sinful; corrupt; filthy; disgusting; of little worth or account; mean; objectionable in any way; disagreeable; bad; brutish; criminal; and immoral.

319.   The Extradition Act requires the demanding Executive Authority produce a copy of indictment found or an affidavit made before a magistrate. All of defendant Prosecutor Bohling's papers were made before a "Notary Public".

320.   Plaintiff had been illegally "arrested and secured" 45 days before Washington Governor Christine Gregoire signed her illegal Governor's Warrant; 39 days before Assistant Attorney General Paul Douglas Weisser[16] "APPROVED AS TO FORM" Republican Prosecutor Richard C. Bohling's illegal application for a requisition; 30 days before Wyoming Governor Dave Freudenthal signed his illegal Governor's Warrant; 17 days before defendant Prosecutor Richard C. Bohling signed his illegal application for the return of plaintiff; 17 days before the Honorable Judge Robert A. Castor certified the Warrant he illegally issued in support of defendant Prosecutor Richard C. Bohling's false prosecution; and nine days before defendant Laramie Police Officer Gwendolyn K. Smith executed her "Affidavit of Complaining Witness" in support of defendant Prosecutor Richard C. Bohling's "application for requisition" to Wyoming Democratic Governor Dave Freudenthal.

321.   Because plaintiff was "arrested and secured" before the two Governors issued their Warrants, (a) the proper parties were not before the court; (b) the court lacked subject matter jurisdiction; (c) all of its proceedings of the court after this point were coram non judice; and (d) the issuance of the Governor's Warrants cannot cure these fatal defects caused by plaintiff's unconstitutional warrantless arrests.

322.   Stated differently, the fraud is found in the Extradition and Rendition Power of the Governors being encroached by defendants Bohling, Smith and divers others; the Governors being enslaved; the sovereignty of the State blemished; prerogative and royalty lessened; and the Governors acquiescening in the illegal encroachment.

323.   As a result of the defendants' encroachments and violations of the federal extradition laws, the United States suffered a breach in its federal covenants with the defendants and a breach in its fiduciary duties owed to plaintiff through the

---

[16] Paul Douglas Weisser; WSBA Bar #17918; Admitted: 08/17/1988; Office of the Attorney General; Criminal Justice Division; State of Washington; PO Box 40116; Olympia, WA  98504-0116; (360) 586-1445; fax: (360) 586-1319.

defendants; and plaintiff suffered injuries and damages which all the defendants are jointly and severally liable as claimed herein.

## FOURTH CAUSE OF ACTION
### (Passive and Active Negligence)

324.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-323 inclusive, with the same force and effect as if fully set forth herein.

325.   Between June 1, 2006 and the time of filing of this civil rights action, defendant Governor Dave Freudenthal was kept informed of information as it was developed that indicated he had been betrayed by his agents under both the WIA of 1998 and the federal interstate extradition laws.

326.   Between June 1, 2006 and the time of filing of this civil rights action, defendant Governor Christine O. Gregoire was kept informed of information as it was developed that indicated she had been betrayed by the agents of defendant Governor Dave Freudenthal under the federal interstate extradition laws.

327.   Defendant Governor Dave Freudenthal knew, or was reckless or negligent in not knowing, that his public service career included employment as a United States Attorney.

328.   Defendant Governor Dave Freudenthal knew, or was reckless or negligent in not knowing, that the Counsel to the Wyoming Governor, Christopher A. "Kip" Crofts, served as Assistant United States Attorney in Casper; that it was he who asked Mr. Crofts in 1995 to open and staff a U.S. Attorney branch office in Lander; and that when Mr. Crofts retired from the Justice Department, he accepted his current position as Legal Counsel to defendant Governor Freudenthal.

329.   Defendant Governor Dave Freudenthal knew, or was reckless or negligent in not knowing, that EWW was obligated approximately $4.4million federal under the WIA of 1998, a grant program which defendant Governor Dave Freudenthal was charged with federal administration and oversight.

330.   Defendant Governor Dave Freudenthal knew, or was reckless or negligent in not knowing that EWW was being subjected to financial ruin for refusing to allow the WIA conspirators to control its business affairs.

331.   Defendant Governor Dave Freudenthal knew, or was reckless or negligent in not knowing, that the WIA continuing fraud conspiracy existed.

332.   Pursuant to his administrative duties mandated under the WIA of 1998, defendant Governor Dave Freudenthal knew, or was reckless or negligent in not

knowing, that his agent Mike Martin, together with divers others, intentionally caused the failure of EWW.

333.   Defendant Governor Dave Freudenthal knew, or was reckless or negligent in not knowing that the WIA of 1998 mandated that he conduct an investigation into the cause of the failure of EWW and to report the same to federal authorities.

334.   Defendant Governor Dave Freudenthal knew, or was reckless or negligent in not knowing, that an investigation into the cause of the failure of EWW necessarily required an investigation of EWW's banking activities conducted through defendant Laramie Plains Community Federal Credit Union (LPCFCU).

335.   Defendant Governor Dave Freudenthal knew, or was reckless or negligent in not knowing defendant LPCFCU was an investor in the LEDC.

336.   Defendant Governor Dave Freudenthal knew, or was reckless or negligent in not knowing, that the investigation into the cause of the failure of EWW would and did reveal that on May 16, 2005, defendant LPCFCU bounced the Count Two and Count Three checks in an endeavor to create the appearance of felony check fraud charges to aid and abet retaliation directed against plaintiff.

337.   Defendant Governor Dave Freudenthal knew, or was reckless or negligent in not knowing, that the results of the investigation into the failure of EWW was never reported to federal authorities.

338.   Defendant Governor Dave Freudenthal knew, or was reckless or negligent in not knowing, that in April 2005 his agent Tim Stamp threatened plaintiff with retaliation to prevent plaintiff from disclosing to the Federal Government the existence of the WIA continuing fraud conspiracy and the role of his agent Mike Martin and divers others in causing the failure of EWW.

339.   Defendant Governor Dave Freudenthal knew, or was reckless or negligent in not knowing, that the uniform extradition laws of Wyoming made defendant prosecutor Richard C. Bohling his agent for all federal interstate extraditions to be sought by his State.

340.   Defendant Governor Dave Freudenthal knew, or was reckless or negligent in not knowing, that on May 24, 2005, his agent, defendant attorney and City Councilman A. Joe Hageman, gave defendant prosecutor Richard C. Bohling a check with instructions to commence an illegal prosecution of plaintiff for purposes of silencing plaintiff's whistleblowing activities.

341.   Defendant Governor Dave Freudenthal knew, or was reckless or negligent in not knowing, that the check his agent, defendant attorney and City Councilman A.

Joe Hageman, gave to his agent, defendant prosecutor Richard C. Bohling, was not a product of criminal wrongdoing.

342.   Defendant Governor Dave Freudenthal knew, or was reckless or negligent in not knowing, that his agent, defendant prosecutor Richard C. Bohling, conspired with defendant police officer Gwendolyn K. Smith to obtain a police affidavit and warrant of arrest for use in retaliating against plaintiff.

343.   Defendant Governor Dave Freudenthal knew, or was reckless or negligent in not knowing, that his agent, defendant prosecutor Richard C. Bohling, conspired with defendant police officer Gwendolyn K. Smith to shield Structure Industries, Grant Kupko, Joee Rain Pavlica, Chandler Properties, Sarah Johnson, Bryce Johnson, and Jeremy Francom from malicious prosecution by performing the duties of complaining witnesses before the Honorable judge Robert A. Castor.

344.   Defendant Governor Dave Freudenthal knew, or was reckless or negligent in not knowing, that the probable cause referred to for a warrant under the Fourth Amendment must be supported by oath or affirmation and be submitted to the committing magistrate himself, and not merely to an official accuser.

345.   Defendant Governor Dave Freudenthal knew, or was reckless or negligent in not knowing, that for purposes of probable cause, the magistrate ought to have before him the oath of the real accuser, presented either in the form of an affidavit or taken down by himself on a personal examination, exhibiting the facts on which the charge is based, and on which the belief or suspicion of guilt is founded.

346.   Defendant Governor Dave Freudenthal knew, or was reckless or negligent in not knowing, that the Federal interstate Extradition Act required an indictment found or the affidavits of Structure Industries, Grant Kupko, Joee Rain Pavlica, Chandler Properties, Sarah Johnson, Bryce Johnson, and Jeremy Francom be made before a judge or magistrate before he could make a demand for the return of plaintiff.

347.   Defendant Governor Dave Freudenthal knew, or was reckless or negligent in not knowing, that his agent, defendant prosecutor Richard C. Bohling, did not provide the required affidavits of Structure Industries, Grant Kupko, Joee Rain Pavlica, Chandler Properties, Sarah Johnson, Bryce Johnson, and Jeremy Francom made before a judge or magistrate before he made his demand for the return of plaintiff.

348.   Between June 1, 2006 and continuing to the present, plaintiff has provided documentary evidence to defendant Governor Dave Freudenthal, defendant Governor Christine O. Gregoire, the remaining defendants and more than 900 public officers and employees in Federal and State Government service that the

charges of check fraud were false and fraudulent and that the extradition papers were not in order. See plaintiff's Exhibit 1, pages 42-50; and Document Nos. 1-34; 89-90; 96; 107-108; 137-143; 231A; 243A; 252; 252A; 252B; 261; 261A-261L; 300-306; 309-312; and 314-339.

349.   Defendant Governor Dave Freudenthal knew, or was reckless or negligent in not knowing, that based on the evidence of plaintiff's innocence submitted to him commencing on June 1, 2006 and continuing to present, the Constitution and Laws of the United States and Wyoming uniform extradition law, required him to recall the extradition warrant he issued to defendant Governor Christine Gregoire on May 29, 2006.

350.   Defendant Governor Dave Freudenthal and defendant Governor Christine O. Gregoire, knew, or were reckless or negligent in not knowing, that the Federal Extradition Clause, as implemented by the Federal Extradition Act, authorized them to legally conspire to exchange fugitives.

351.   Defendant Governor Dave Freudenthal and defendant Governor Christine O. Gregoire, knew, or were reckless or negligent in not knowing, that defendant prosecutor Richard C. Bohling had informed them in his application for requisition that plaintiff had already been "arrested and secured" in violation of the Constitution and Laws of the United States before issuing their warrants on May 29, 2006 and June 15, 2006, respectively. See Plaintiff's Exhibit 1 at page 5.

352.   All of the defendants owed EWW and plaintiff a duty of care while engaged in the practice of maintaining peace and lawfulness. In carrying out their duties as public servants, the defendants had a duty to observe and protect the constitutional, statutory and common law rights of plaintiff and EWW.

353.   Defendants conspired to violate and did violate plaintiff's constitutional, statutory and common law rights and breached the duties owed as described more particularly herein.

354.   The violations occurred in part, as a result of defendant's lack of proper training; education; negligent investigation; maladministration; faulty reliance on undefined facts; unlawful search and seizure without a warrant; negligent supervision; lack of discipline and leadership; and enactment, enforcement and violation of ineffective State, County and local regulations, policies and procedures in furtherance of the purpose and object of the Wyoming WIA continuing fraud conspiracy..

355.   As a result of the defendants' encroachments and violations of the federal extradition laws, the United States suffered a breach in its federal covenants with the defendants and a breach in its fiduciary duties owed to plaintiff through the

defendants; and plaintiff suffered injuries to her person, resulting in the damages described herein which all the defendants are jointly and severally liable.

## FIFTH CAUSE OF ACTION
### (First Amendment Speech Retaliation)

356.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-355 Inclusive, with the same force and effect as if fully set forth herein.

357.   The WIA continuing fraud conspiracy has as one of its objects retaliation to prevent disclosure to the Federal Government the existence of the illegal "bait and switch" scheme riding piggyback on the WIA of 1998.

358.   Defendants Laramie Plains Community Federal Credit Union; Laramie Boomerang; Casper Star-Tribune, Casper, Wyoming; News Corporation; MediaNews Group; and The Associated Press specially contributed their resources to aid and abet the government actors in an endeavor to further the WIA continuing fraud conspiracy.

359.   Defendants Laramie Boomerang; Casper Star-Tribune, Casper, Wyoming; News Corporation; MediaNews Group; and The Associated Press never made an effort to contact plaintiff and learn plaintiff side of the story they were telling the public.

360.   When defendants Laramie Boomerang; Casper Star-Tribune, Casper, Wyoming; News Corporation; MediaNews Group; and The Associated Press were given plaintiff's side of the story, they chose not to report it of correct their story to show conflicting views.

361.   The public dissemination of the May 2005 and the June 15, 2006 false light publications were limited to the State of Wyoming, yet plaintiff was residing in the State of Washington at the time of both publications.

362.   At all times relevant to this Civil Rights Complaint, plaintiff (1) was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.

363.   The purpose of defendants Laramie Boomerang; Casper Star-Tribune, Casper, Wyoming; News Corporation; MediaNews Group; and The Associated Press

false light publications was to further the object of the WIA continuing fraud conspiracy: silence a federal whistleblower with retaliation.

364.   Each act of defendants Laramie Plains Community Federal Credit Union; Laramie Boomerang; Casper Star-Tribune, Casper, Wyoming; News Corporation; MediaNews Group; and The Associated Press directly and proximately caused plaintiff's injuries and the damages claimed herein, for which all defendants are jointly and severally liable.

## SIXTH CAUSE OF ACTION
### (Fourth Amendment Unreasonable Seizure)

365.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-364 inclusive, with the same force and effect as if fully set forth herein.

366.   The right of plaintiff to be secure in her person, her house, her papers, and her effects against unreasonable searches and seizures has been "clearly established" since 1789 by the face of the constitutional amendment.

367.   The Fourteenth Amendment to the United States Constitution prohibits every State from making or enforcing any law which will abridge the privileges or immunities of citizens of the United States. The provision also commands that no State may deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

368.   The probable cause referred to for a warrant under the Fourth Amendment must be supported by oath or affirmation and be submitted to the committing magistrate himself, and not merely to an official accuser.

369.   Stated differently, for purposes of probable cause, the Honorable Wyoming State Judge Robert A. Castor ought to have had before him on December 20, 2005, the oath of plaintiff's real accusers, presented either in the form of an affidavit or taken down by himself on a personal examination, exhibiting the facts on which the charge is based, and on which their belief or suspicion of guilt was founded.

370.   The Federal interstate Extradition Act required an indictment found or the affidavits of Structure Industries, Grant Kupko, Joee Rain Pavlica, Chandler Properties, Sarah Johnson, Bryce Johnson, and Jeremy Francom be made before Judge Castor before Governor Dave could make a demand for the return of plaintiff and for plaintiff to be "arrested and secured" by order of Governor Gregoire. Plaintiff could not ever be "arrested and secured" before this scheme had matured.

371.   The required affidavits of Structure Industries, Grant Kupko, Joee Rain Pavlica, Chandler Properties, Sarah Johnson, Bryce Johnson, and Jeremy Francom made before a judge or magistrate do not now exists nor have these affidavits ever existed.

372.   On May 1, 2006 at approximately 1:15p.m., plaintiff received a call from an acquaintance that police were looking for her.

373.   Plaintiff assumed that the purpose of the visit was to follow up on the report of computer hacking filed with defendant Battle Ground Police Department (BGPD). See Document No. 7, pages 60-62 at http://www.emccray.com.

374.   Plaintiff contacted defendant BGPD and gave them the time of 10:30p.m. to meet at plaintiff's home address in Brush Prairie, Washington.

375.   Plaintiff was eagerly looking forward to discussing her case with police. Plaintiff left the City of Laramie out of fear for her life, only to be confronted by an individual who wanted to extort money from plaintiff. See Document No. 7, pages 52-59 at http://www.emccray.com.

376.   At all times pertinent hereto, plaintiff was innocent of any wrongdoing, was unarmed and was lawfully engaging in peaceful activities.

377.   At all times pertinent, plaintiff acted lawfully and committed no act or acts which would give rise to an arrest, search, seizure, or otherwise justify an invasion and or violation of plaintiff's constitutional, statutory and common law rights.

378.   The police promptly arrived at 10:30p.m. At all times pertinent hereto, plaintiff was innocent of any wrongdoing and believed plaintiff had not engaged in any wrongdoing.

379.   Without any pleasantries and without any explanation and certainly without conducting any reasonable inquiry to determine any guilt or innocence of plaintiff, the officers

380.   On May 1, 2006 defendant police Does One and Two, acting under the color of laws of the States of Wyoming and Washington, under force and arms: (1) invaded the sanctity and privacy of plaintiff's home; (2) stealthily approached plaintiff and placed handcuffs on her wrists; (3) detained Plaintiff; (4) restrained plaintiff's liberty by means of force and show of authority; (5) assaulted plaintiff; (6) searched plaintiff's person; and (7) briefly searched plaintiff's residence and effects; all without warrant, probable cause, legal justification or exigent circumstances.

381.   Plaintiff asked the officers numerous times what was going on and their only reply was that plaintiff was being taken to Wyoming.

382.   Plaintiff was absolutely hysterical. Plaintiff begged and pleaded to see their warrant of arrest. They said they did not have one; or that they would get one at the station. Without cause, without the benefit of a warrant and without exigent circumstances, plaintiff was now restrained of her liberty by strangers claiming to be police officers taking her back to Wyoming.

383.   Plaintiff was now in tremendous fear of her life. Plaintiff had left Wyoming out of fear for her life and now the police, whom she had grown up to trust and did deeply trust, were now telling plaintiff she was going back to the hell she had escaped just a year prior.

384.   Plaintiff begged to call family members; but plaintiff's pleas fell on deaf ears. The thought of truly being in custody now hit plaintiff like a ton of bricks. Plaintiff is now being forcibly removed from the safety and security of her home and placed in a strange car for transportation. Plaintiff is nauseated.

385.   Plaintiff kept thinking; wondering; this is crazy; this is not real; this is not happening to Plaintiff. Plaintiff is innocent. Plaintiff is a good Christian. Plaintiff has done nothing wrong.

386.   Plaintiff opened her door with trust and Christian love and allowed police defendants Doe One and Doe Two to enter. Now, having individuals dressed in police clothes claiming to be taking plaintiff back to Wyoming hell immediately and permanently shattered plaintiff's mental image of police. All of the trust, respect, love and dignity is now lost forever.

387.   On June 5, 2008, an acquaintance discovered a police business card left by defendant BGPD. Detective Kimberly Armstrong wants to have a conversation. Plaintiff now begins to experience a new surge of stress and ill.

388.   Suddenly on June 13, 2008 at approximately 6:30p.m. the nightmare of May 1, 2006 is repeated. Police defendants Doe Three and Doe Four encountered plaintiff in her driveway as she was moving from her car towards the front door. Acting under the color of laws of the States of Wyoming and Washington, and under force and arms, the officers: (1) detain Plaintiff; (2) restrain plaintiff's liberty by means of force and show of authority; (3) assaulted plaintiff; and (4) searched plaintiff's person, residence and effects; all without warrant, probable cause, legal justification or exigent circumstances as neighbors looked on.

389.   Plaintiff is now in absolute fear that she is being "kidnapped" again. Plaintiff is now wondering what all of this is having on her children; her siblings; her father;

and her friends. The thought of being deprived of seeing her grandchildren, possibly never again, numbs plaintiff. Plaintiff now suffers from premature progressive mental deterioration.

390.   Now plaintiff is wondering about the impact on her life and health. Plaintiff begins to fear the onset of cancer and other irreparable damage.

391.   Plaintiff has a fear of driving and being pulled over on a warrant fraudulently entered into the local, state and national crime computer.

392.   Plaintiff has a fear of traveling to other states for fear of the trauma of the false arrests repeating themselves again.

393.   Plaintiff has not recovered from this trauma. Two years later and plaintiff is starting to see gray hair when she had none before. Plaintiff has lost some weight. Plaintiff is now beginning to worry about medical bills for stress and cancer and the astronomical impact all of this is having on her family.

394.   The arrests, both without warrant, indicated this unlawful behavior, physical and mental abuse and intimidation were accepted practices and customs of the defendant government entities and their agents.

395.   At no time did plaintiff pose a threat to the safety of the officers or others, actively resist the officer's demands, or attempt to evade arrest by flight. The actions on both occasions by the four officers were unreasonable.

396.   Defendant police officers Does One through Four knew, or were reckless or negligent in not knowing that no probable cause existed for their warrantless arrests; that they could not make the arrests with the order or direction of defendant Governors Dave Freudenthal and Christine O. Gregoire; and that the warrants of these two Governors did not exist.

397.   The conduct of police defendants Does One through Four violated clearly established constitutional and statutory rights of which a reasonable person would have known.

398.   The policies, practices and procedures of defendant State of Wyoming and defendant State of Washington caused the violations of plaintiff's constitutional rights under U.S. Constitution Article 4, Section 2, Clause 2, Amendments Fourth and Fourteenth and Title 18 U.S.C.A. § 3182.

399.   Police defendants Does One through Four committed the unlawful actions and constitutional and statutory violations cited herein pursuant to directions from superiors, policy statements, ordinances, regulations, customs, practices, standard

operating procedures and polices or official decisions adopted and or promulgated by the officers and or officials of defendant Battleground Police Department in furtherance of the purpose and object of the Wyoming WIA continuing fraud conspiracy.

### SEVENTH CAUSE OF ACTION
### (Right of Privacy)

400.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-399 inclusive, with the same force and effect as if fully set forth herein.

401.   The intrusions into plaintiff's home on May 15, 2005 and May 1, 2006; the false light publications of defendants Laramie Boomerang; Casper Star-Tribune, Casper, Wyoming; News Corporation; MediaNews Group; and The Associated Press between May 20-23, 2005 and again on June 15, 2006; the illegal police investigations; the illegal placement of plaintiff's personal data into the crime computers of defendants Washington State Patrol, Clark County Sheriff; Albany County Sheriff and Battle Ground Police Department, all violate plaintiff's constitutional right to privacy under Federal and the Laws of the States of Washington and Wyoming.

402.   There was never probable cause for anything activities the defendants engaged in. All disclosed facts were private matters that plaintiff was entitled to keep private.

403.   These invasions of plaintiff's privacy were offensive and objectionable to plaintiff and to a reasonable person of ordinary sensibilities. A reasonable person of ordinary sensibilities would be offended by the disclosure of false criminal charges of which plaintiff has never committed.

404.   Defendants acted with reckless disregard for the fact that a reasonable person of ordinary sensibilities would find their invasions highly offensive. Defendants sent rumors; caused the false charges to be reported over the Internet, on television and in the papers knowing well and good that plaintiff had not committed any of the crimes for which the public was being told she committed.

405.   Plaintiff is a very good and obedient Christian and has always sought to live a private and law-abiding life. As a Christmas message, plaintiff was sent the following email:

> "Dear Lynn,
> Why don't you go fuck yourself and the money owed you. How dare you
> complain about that when you have ripped off so many people. Oh and

> Merry Christmas, you two faced christian bitch! And just in case you
> haven't figured it out, you get no refund until you pay me the
> $10,000.00+ you owe me. So shut the fuck up! You have any
> complaints, you contact me, not NetBoise."

See Document No. 7, page 57 at http://www.emccray.com.

406.   It was this and other extortion-type emails that plaintiff had reported to
defendant Battle Ground Police Department. This was the issue plaintiff was
hoping to discuss with police on the dreaded night of May 1, 2006. This is why
plaintiff's trust of police will never be the same ever again.

407.   Plaintiff's venture into the State of Wyoming was to do something good for
the many.

408.   As a direct and proximate result of defendants' wrongful conduct, plaintiff
was exposed to contempt and obloquy and the loss of reputation and standing
among the recipients of publications and in the community, all of which caused
plaintiff humiliation, severe depression, anxiety, emotional distress, and other
incidental and consequential damages and expenses, in a total amount to be
established by proof at trial, for which all defendants are liable.

## EIGHTH CAUSE OF ACTION
(Tortious Interference With a Prospective Business Relationship)

409.   Plaintiff repeats and realleges each and every allegation contained in
paragraphs 1-408 inclusive, with the same force and effect as if fully set forth
herein.

409.   The defendants tortiously interfered with EWW contractual relationships
with the federal Government and its employment relationship with its employees,
among them was plaintiff.

410.   The defendants were without privilege interfere with this business
relationship; the defendant's had knowledge of this relationship; the defendants'
intentional interference with this relationship caused a breach of contracts and
termination of the relationship between EWW and the federal Government and
EWW and its employees and plaintiff resulting in damages therefrom for which all
the defendants are jointly and severally liable.

## NINTH CAUSE OF ACTION
(42 U.S.C. § 1983)

411.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-410 inclusive, with the same force and effect as if fully set forth herein.

412.   The hereinbefore described actions and omissions with respect to the WIA, April 2005 and May 24, 2005 continuing fraud conspiracies were authorized, condoned, approved and or ratified by each of the defendants or agents of each of the defendants which deprived plaintiff of certain his rights and immunities secured to plaintiff by the Constitution and Laws of the United, thereby proximately causing the injuries and damages complained of herein.

413.   The defendants admitted that they committed their unlawful actions and constitutional deprivations under color of the laws of the States of Wyoming and Washington cited herein pursuant to directions from superiors, policy statements, ordinances, regulations, customs, practices, standard operating policies and procedures, or official decisions adopted and or promulgated by the officer or officials of the state entities.

414.   The defendants and each of their agents were deliberately indifferent to and acted in conscious disregard for the need to observe the plaintiff's constitutional rights to train, supervise and discipline law enforcement officers employed by them with respect to, *inter alia*, initiating and conducting investigations which impact citizens or in any way restrain the rights of citizens.

415.   The individuals who violated plaintiff's constitutional and statutory rights, or facilitated the violation of plaintiff's rights, were, or were acting under the direction of, officials with final policy-making authority.

416.   The defendants all employed a policy of inaction or acquiescence relative to official misconduct which resulted in a failure to protect plaintiff's constitutional and statutory rights. The inaction and or acquiescence amounted to deliberate indifference

### TENTH CAUSE OF ACTION
### (42 U.S.C. § 1985)

417.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-416 inclusive, with the same force and effect as if fully set forth herein.

418.   All of plaintiff's injuries and damages, and the injuries and damages of plaintiff's former employer, Events WorldWide, are directly derived from two distinct continuing fraud conspiracies—the Federal Workforce Investment Act of 1998 Continuing Fraud Conspiracy (WIA Conspiracy), in existence since the year of

1998 and the Federal Interstate Extradition Continuing Fraud Conspiracy (IECFC), in existence since the year of 1789; both of which flourish with the aid of lawyers and or legal advocates.

419.   The defendants each, personally or through their agents or employees, deliberately took a sure means to "elude all laws and violate them in fact without appearing to break them in form". They each accomplished their deeds with the aid of lawyers and or legal advocates in furtherance on the WIA continuing fraud conspiracy to violate plaintiff's civil rights, resulting in damages for which all the defendants are jointly and severally liable.

## ELEVENTH CAUSE OF ACTION
### (Fourteenth Amendment State Liability)

420.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-419 inclusive, with the same force and effect as if fully set forth herein.

421.   The hereinbefore described acts and omissions with respect to the withholding of WIA funds, plaintiff's unconstitutional warrantless arrests on May 1, 2006 and June 13, 2008 were engaged in under color of the laws of the defendant States of Wyoming and Washington by the agents of these defendant and their private associates.

422.   The defendant State of Wyoming and the defendant State of Washington are responsible for the acts of the conspiracy of their agents and their private defendant associates because of their authorization, condonation, approval and or ratification of the conspiratorial acts of their agents and their private defendant associates which deprived plaintiff of her rights, privileges and immunities secured to plaintiff by the Constitution and Laws of the United States of America, including but not limited to, plaintiff's Fourth, Fifth and Fourteenth Amendment rights to be secure in her home and person, substantive and procedural due process of law and equal protection of law.

## TWELFTH CAUSE OF ACTION
### (Negligent Infliction of Emotional Distress)

423.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-422 inclusive, with the same force and effect as if fully set forth herein.

424.   The negligent acts and omissions of the defendants caused serious or severe emotional distress to plaintiff. Plaintiff's serious or severe emotional distress was a

5.  Attorney fees pursuant to 42 U.S.C. § 1988;

6.  An injunction against the Defendants;

7.  Retain jurisdiction of this action to ensure compliance with its decree;

8.  An award of costs;

9.  Such other and further relief as the court deems just and proper.

Dated: August 12, 2008

Lynn Ann Hust
Plaintiff, Pro Se

## VERIFICATION

1.  I am the Plaintiff in this action.

2.  I have read the Complaint and every statement in it is true and correct within my personal knowledge.

3.  I signed this Verification on August 12, 2008 at Battle Ground, County of Clark, State of Washington.

Lynn Ann Hust
Plaintiff, Pro Se